**UNITED STATES of America,**
**Appellee,**

v.

**Edmund ROSNER, Defendant-**
**Appellant.**

**No. 1057, Docket 73–1511.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1973.

Decided Sept. 26, 1973.

Alan Dershowitz, Cambridge, Mass., for defendant-appellant.

Elliot G. Sagor, Kenneth R. Feinberg, John D. Gordan, III, John W. Nields,

Asst. U. S. Attys., of counsel (Paul J. Curran, U. S. Atty., Southern District of New York), for appellee.

Paul G. Chevigny, New York City, Edwin J. Oppenheimer, of counsel (American Civil Liberties Union), as amicus curiae.

Before MOORE and OAKES, Circuit Judges, and GURFEIN,* District Judge.

GURFEIN, District Judge:

This is an appeal from a conviction of Edmund A. Rosner, a practicing lawyer, of the crimes of conspiracy, 18 U.S. C. § 371, obstruction of justice, 18 U.S. C. §§ 1503 and 2, and of three counts of bribery, 18 U.S.C. §§ 201(b) and 2, and 3237. The indictment was filed on July 5, 1972, naming appellant and Nicholas DeStefano, a private investigator, and Nicholas Lamattina, a New York City policeman, as co-defendants. Each of the co-defendants pleaded guilty in circumstances to be related. Neither testified at Rosner's trial which began on November 20, 1972 and ended on December 5, 1972. Judge Bauman sentenced appellant on March 20, 1973 to imprisonment for five years on each count to run concurrently. The basic issue raised is whether appellant was entrapped as a matter of law and whether, alternatively, the trial judge erred in his charge on entrapment. Rosner made two motions for a new trial on the basis of newly discovered evidence.[1] The second motion, which was denied after an evidentiary hearing, raised the claim of governmental violation of appellant's Sixth Amendment right to privacy of communication with his counsel.

I.

*The Evidence at the Trial.*

We must view the evidence in the light most favorable to the Government after a conviction, see United States v. Smalls, 363 F.2d 417 (2 Cir.

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The denial of the first motion is irrelevant to this appeal.

1966), cert. denied, 385 U.S. 1027, 87 S. Ct. 755, 17 L.Ed.2d 675 (1967).

(a) *The Rosner Subornation of Perjury Case (Rosner I).*

In August 1971 Rosner was under indictment (70 Cr. 1030, hereinafter *"Rosner I"*), with DeStefano and two co-defendants on charges of suborning perjury and procuring false alibi testimony from one Pedro Hernandez and three others at a Federal narcotics trial that had been held in March 1967. The *Rosner I* indictment was ultimately dismissed on January 24, 1972 for failure of the Government to prosecute, due to the disappearance of its chief witness, Hernandez. The crimes here charged took place while the *Rosner I* indictment was still pending.[2]

(b) *The Martinez-Marcone Situation.*

In August 1971 the Grand Jury was also investigating the dismissal in February 1970 of a narcotics case against Felix Martinez in Queens Supreme Court. Targets included Dominick Marcone, a bail bondsman, the arresting police officers, and their associates. Detective Robert Leuci of the New York Police Department was asked by the United States Attorney's office to investigate the *Martinez* matter in an undercover capacity.[3] Leuci agreed to hold himself out as a corruptible policeman.

(c) *The Events that Followed.*

On September 28, 1971 Leuci called co-defendant Lamattina, also a police detective, to arrange a meeting. Leuci knew that Lamattina had been connected with the *Martinez* case. On September 30 Leuci, wired with a recording device, met Lamattina and represented that he had a "contact" in the United States Attorney's office. His "contact" was, in fact, Special Assistant United States Attorney Scoppetta, Leuci's supervisor in the undercover investigation. Divulging to Lamattina that his "contact" was active in the *Marcone* situation under federal investigation, Lamattina, in turn, told Leuci that it was DeStefano who had "asked me to get in touch with the detectives who made the arrest in the case," and that the detectives had told Lamattina that for $25,000 they would see to it that Martinez went free.[4] Lamattina arranged, at his own suggestion, for Leuci to meet with DeStefano and Marcone. At this meeting, there was a brief discussion of Marcone's case, during which Leuci revealed information purportedly relayed to him by his "contact." As Marcone left, he asked De-Stefano to "get whatever you can get." Lamattina and DeStefano went into a "semi-huddle;" Leuci overheard De-Stefano say "[t]hat Rosner thing is important to me, too." Talk shifted from the next meeting place to *Marcone* and from *Marcone* to drugs, before De-Stefano said, "You know, you can help me with something else, something else I am interested in." Leuci replied that he knew that DeStefano meant "The Rosner situation." And DeStefano affirmed "Yes, that's right." DeStefano asked Leuci to approach his "contact" about the matter immediately, and said that a meeting would be arranged for the next day. When DeStefano told Leuci he would like to bring Rosner along, Leuci balked, telling DeStefano "I didn't think that [bringing Rosner] was such a good idea and I wasn't so crazy about Rosner. I said I didn't know him but from things I had heard about him I wasn't so crazy about the idea of him [DeStefano] bringing him [Rosner]."

2. Judge Metzner ordered dismissal on January 24, 1972, thirteen months after the indictment had been filed. The Government's appeal was dismissed for lack of jurisdiction and the petition for mandamus was denied by this Court in United States v. Di Stefano [sic], 464 F.2d 845 (2 Cir. 1972).

3. Detective Leuci had in February 1971 been in working contact with Commissioner of Investigations Nicholas Scoppetta while the latter was employed as an attorney for the Knapp Commission. Mr. Scoppetta was appointed Special Assistant United States Attorney in June 1971 and was involved in the *Marcone* investigation. It was Scoppetta who approached Leuci in August 1971.

4. Martinez was never prosecuted.

DeStefano reassured Leuci that Rosner was "a thousand per cent guy." A meeting was set for October 1, 1971.

Rosner did not attend the meeting on October 1. Instead Leuci again met with Lamattina and DeStefano. The *Marcone* case was discussed, and DeStefano told Leuci that Rosner had declined the invitation to attend the meeting because "he felt that he had the case beat" but that Rosner would be in touch "if the need ever arised" [sic]. Leuci did not press to meet Rosner, but replied "it's fine." Another meeting was arranged for October 4.

On October 4, Leuci met Lamattina and they entered a coffee shop, where Rosner and DeStefano were seated at a table. Leuci was frisked for a listening device which he was not wearing. Rosner asked Leuci about the *Marcone* case. After some discussion of the *Marcone* case, Rosner asked Leuci "Can your friend help us in our case?" Leuci said "I think he can. You ask me what you want and I will put it to my friend." Rosner said he wanted 3500 material. Rosner told Leuci that he understood that there were four witnesses in the case and that "two are good and two are bad," and that he "would like to find out what two are good and what two aren't good."

Leuci told Rosner that although his contact had not yet established a price for the information Rosner wanted, Leuci "would appreciate it if something were done" for his "contact" in the United States Attorney's office, "as soon as possible." Rosner and DeStefano stepped away from the table and Leuci saw Rosner pass DeStefano some money. When they returned to the table DeStefano passed Leuci $400 under the table. Rosner turned the conversation back to the *Marcone* investigation and then went to pay the check. DeStefano and Lamattina approached Leuci separately and counselled Leuci that if he wanted to get more money he would have to "put Rosner in deeper." Outside the restaurant Rosner told Leuci that if his "contact" could get what he

had asked for "there would be a lot more for him [the 'contact'] in the future."

On October 6, Leuci, DeStefano and Lamattina met again. DeStefano told Leuci that Rosner harbored suspicions that Leuci might be working for the Government because of newspaper revelations about the *Marcone* investigation. DeStefano warned Leuci that if he were an undercover agent "This world is not a big enough place for you to hide in." There was some discussion of the amount Leuci wanted for his "contact" and whether Leuci could obtain a copy of the *Marcone* indictment as well as information on *Rosner I*. DeStefano told Leuci that Rosner should be told that the asking price for both was $5,000. Thus, Rosner would pay $2,500, thinking that was half, but since DeStefano would pay only $1,000, Leuci and his "contact" would actually gross $3,500.

On October 8, 1971 Leuci met DeStefano, and Leuci told him that he had photocopies of the 3500 material in *Rosner I* and a draft copy of the *Marcone* indictment. DeStefano said he would call Rosner, and DeStefano gave Leuci $100 "for you and your friend." After Lamattina's arrival, Leuci showed DeStefano, in Lamattina's presence, a draft copy of the *Marcone* indictment and the statements of three witnesses. When Rosner appeared, DeStefano stood up and the two walked to the back of the restaurant. They returned and sat down. Rosner said "Everything is going to be all right." DeStefano explained to Leuci that Rosner meant that Leuci would get his money but not that night. When Leuci pressed the matter, Rosner promised he would get Leuci the money after the holiday weekend, but that he would give the money to DeStefano who would give it to Leuci.

After reading the 3500 statements at a nearby table Rosner stated, "No figure has been quoted to me . . . you will get $2,500." DeStefano and Rosner asked questions about a "list of witnesses" and whether they could get more statements. The meeting ended with Rosner asking "to study the *Marcone* in-

dictment over the weekend." Leuci gave it to him.[5]

On October 12 Leuci, this time wearing recording equipment, met with DeStefano. DeStefano asked Leuci for the Grand Jury minutes in the *Rosner I* case. Leuci said that would cost extra. Leuci told DeStefano to charge Rosner $2,000 and to keep half himself. They haggled and agreed upon $1,500. Saying that the money came from Rosner, DeStefano gave Leuci money which Leuci had been promised on October 8. DeStefano withheld some, and gave Leuci $1,150 in a cigarette package. A meeting was arranged for the next day.

On the evening of October 13, Leuci approached the Royal Pub Restaurant wearing his recording equipment. Before Rosner's arrival, DeStefano asked whether Leuci knew if one George Stewart was cooperating with the Government. Leuci said he would try to find out. Rosner then appeared, and they discussed getting the Grand Jury testimony. Leuci repeated that it would cost an additional $1,500 and Rosner said "It is worth it" despite Leuci's remonstrance that it was not. Rosner insisted that the minutes be obtained by Friday. Leuci saw Rosner remove a sum of money from his pocket and give it to DeStefano. DeStefano and Leuci then walked to the "bathroom" where DeStefano passed Leuci $850.

Out of Rosner's presence, Leuci asked DeStefano to guarantee that Stewart would not be killed if Leuci gave DeStefano the information about Stewart's status and whereabouts. DeStefano refused, saying Stewart was "a bad guy" who was "going to hurt a lot of people."

On October 15, Leuci met Rosner and DeStefano at the Dayton Cafeteria.[6] Leuci reported that he would have the Grand Jury minutes in a few days but that he was unable to get any information on Stewart. Rosner agreed to the

delay in getting the minutes, and asked Leuci whether there were any witness' statements which Leuci had not given to Rosner. Leuci assured Rosner there were none. Rosner then asked Leuci for the "yellow sheet" on one of the three witnesses whose statements Rosner had seen. Rosner, who had represented Stewart, gave Leuci some background information on Stewart, saying he was sure there was a file on Stewart, and asked Leuci's "contact" to "peek again" at the records.

On October 18, 1971 Leuci received copies of the Grand Jury testimony of Hernandez, Beltram and Pulido, the three witnesses whose statements Rosner had already been given in the form of 3500 material. Leuci met with Lamattina and DeStefano on the evening of October 18, 1971. DeStefano entered Leuci's car which was "wired" and Leuci gave him the Grand Jury minutes, the conversation being recorded.

On October 19 Leuci was electronically wired. DeStefano told Leuci that he was waiting for Rosner, who was bringing the money. Rosner appeared and walked around the corner with DeStefano. Through the panes of glass in the corner building Leuci saw Rosner hand something to DeStefano. DeStefano then gave Leuci $350.

The appellant testified in substance as follows:

DeStefano told him on October 2 that the United States Attorney's Office was preparing to indict him in the *Marcone* case; that a witness was testifying against him before the Grand Jury; and that Federal agents suspected that Rosner had the Government's chief witness, Hernandez, killed in the pending subornation of perjury case, *Rosner I*. He testified that by October 3 his head was swimming and he was becoming panicky.

On October 4, DeStefano told him it was important that Rosner attend the meeting with Leuci. At the October 4

---

5. The Government does not contend that Rosner paid money for this opportunity to look at the indictment. The bribe payments

are alleged only in connection with 3500 material and Grand Jury testimony.

6. This conversation was tape recorded.

meeting, Leuci told Rosner that Rosner was suspected of having Hernandez killed. Rosner testified that he brushed the suggestion off as "ridiculous" and that he protested his own innocence in *Rosner I*. Rosner testified that on October 7 DeStefano told him that the Government was conducting a complete investigation of Rosner. He admitted that he did read and retain the 3500 material, but denied that he had taken the *Marcone* draft indictment; he refused to pay Leuci at first because he thought "Leuci was doing us a favor;" but he conceded that he ultimately gave DeStefano $1,250 on October 12 to pay Leuci, as his share of the $2,500, only because of pressure from DeStefano to split the cost. Rosner testified that Leuci had told him on October 8 that this money would also cover Grand Jury minutes.

Rosner testified that Leuci pressured him into paying additional money for the Grand Jury minutes. Rosner admitted that he gave DeStefano $750 on October 19 as his share of the $1,500 for the Grand Jury minutes.[7]

This ended the conspiracy, but DeStefano and Lamattina continued to see Leuci.

## II.

### The Evidence upon the New Trial Motion.

(a) *Conferences with the Prosecutors.*

On December 20, 1971 Leuci met with DeStefano and Lamattina to discuss a criminal matter unrelated to *Rosner I*. During the meeting they discovered that Leuci was acting in an undercover capacity for the Federal Government. DeStefano and Lamattina were immediately taken to the United States Courthouse where they were given *Miranda* warnings, and confronted with the Government's knowledge of the events which later formed the basis for the indictment. Neither one supplied any information that night, but they did agree not to divulge Leuci's cover. They also agreed to meet the investigators again to determine whether there were ways in which they would cooperate.

They did meet Assistant United States Attorneys about thirty times right up to the time they were indicted in this case on July 7, 1972. The recurrent theme of these meetings was whether the pair would cooperate in the instant *Rosner II* case, which they consistently refused to do. Judge Bauman found this refusal to have been "steadfast" and "from the outset" by both men.

Although they refused to cooperate against appellant, DeStefano did assist the Government in April 1972 by effecting an introduction between an undercover agent and Leon Wasserberger, a co-defendant in United States v. Archer. 486 F.2d 670, 673–674 (2 Cir. 1973). Lamattina also cooperated in two instances, in May and June 1972, in investigations unrelated to Rosner.

On June 15, 1972, enterprising reporters revealed Leuci's undercover roles in the *Daily News* and *New York Times*. Immediately DeStefano and Lamattina stopped cooperating with the Government even on unrelated matters. When they were indicted about three weeks later they stopped their talks with the United States Attorney's office entirely.

The first renewed contact was a few weeks before the scheduled November 20, 1972 trial. DeStefano called Scoppetta to arrange a meeting. Scoppetta met with him and another assistant prosecutor, Ben-Veniste, who asked DeStefano to assist the Government in its investigation of corruption. He refused. The Rosner case was not mentioned. The prosecutors then met with Lamattina, as well, at his request. The subsequent discussions with the Government will be summarized when we discuss the contention that DeStefano and Lamattina, as Government agents, invaded the privacy of appellant's conversations with his attorneys.

---

7. We have gone into the evidence at some length because of the defense of entrapment.

(b) *Conferences with the Defense Team.*

During the post-conspiracy pre-indictment period, DeStefano was present at numerous meetings where Rosner and his lawyers discussed various aspects of the *Rosner II* case. Lamattina was present during only one such meeting.

On June 16, Rosner and his wife, Nancy, who was one of his counsel in the proceedings below, ran into DeStefano accidentally. The newspaper revelation that Leuci was an undercover agent naturally prompted a wide-ranging discussion of the joint predicament of appellant and DeStefano. The Government did not know of this meeting until the post-trial hearing.

On June 30 Rosner, DeStefano and Lamattina appeared before the Grand Jury. Before they appeared, DeStefano participated in a conference with Rosner and Rosner's several lawyers. After the Grand Jury appearances, DeStefano and Lamattina joined Rosner and their lawyers at lunch, where the case was discussed. After the indictment, Lamattina participated in no more legal conferences, but DeStefano met Rosner alone quite often, and with his lawyers on a number of occasions. The topics discussed ranged over the various aspects of the defense case, including cross-examination of Leuci and the elements of entrapment.

A new phase began when Lamattina pleaded guilty on November 20, when the trial was about to begin. DeStefano met with Rosner and Nancy Rosner to discuss whether it would be advantageous to Rosner's defense of entrapment if DeStefano also pleaded guilty. After Lamattina pleaded guilty, he was "debriefed" by the prosecutors on November 22 and November 24.

DeStefano pleaded guilty on November 21, 1972. On November 22 DeStefano requested a meeting with the Government, without his lawyer, to discuss the possibility of cooperation.

DeStefano met with the Government again on November 24 for several hours for the last time during the trial.[8]

On November 27 DeStefano went to Rosner's office and participated in a two-hour discussion about *Rosner II* with Rosner and his lawyers. Among the matters discussed was Leuci's testimony. Nancy Rosner testified that DeStefano called the Rosners at home during the trial several times to inquire what had happened on a particular day, whether the Rosners thought Lamattina would be a witness, whether character witnesses would be called, and to talk about the media coverage of the trial.

There was no testimony that DeStefano communicated these conversations to the Government attorneys. The Government attorneys denied the receipt of any information gathered by DeStefano from such conversations.

### III.

*Entrapment.*

Although appellant admitted that he had paid Leuci through DeStefano for the 3500 material and the Grand Jury minutes, he contends that he was unlawfully entrapped *as a matter of law* and that the indictment must, therefore, be dismissed. He says that the due process clause forbids the conviction of a defendant on charges which stem from his acceptance of a government offer of corrupt assistance in a criminal case pending *against himself*. He argues that his criminal conduct would not have been possible had not an undercover agent supplied an indispensable means, otherwise unavailable, for the commission of the crime, and that the evidence was insufficient to sustain a finding that he was predisposed to commit the crime. In the alternative, he contends that the trial judge charged the jury improperly on the defense of entrapment. For reasons that will appear, we reject each of these contentions.

---

8. There were no tapes or records of these meetings or of what was said. The Government attorneys who participated were all examined as witnesses by defense counsel.

The substance of Rosner's defense of entrapment is that he was coerced into crime by Leuci, a Government agent, posing as a corrupt police officer, with the aid of DeStefano and Lamattina. He asserts that he was "coerced" by being told that he was being investigated in connection with the murder of a missing witness in the *Rosner I* case; that the Government was investigating him generally; and that he was to be indicted in connection with a "payoff" in the *Marcone* case.

■ It is clear that Leuci did not approach DeStefano about Rosner. Leuci told Lamattina that he had a "contact" in the United States Attorney's office who might be able to provide information to friends of Lamattina who were the targets of a Federal investigation of corruption in the *Marcone* case. This led to an introduction of DeStefano and Marcone. Rosner was not mentioned. When DeStefano whispered to Lamattina "[t]hat Rosner thing is important to me, too," discussion began about whether Leuci's "friend" could help in the *Rosner I* case.

When DeStefano said he would bring Rosner to meet Leuci, Leuci expressed doubts about Rosner's reliability. When DeStefano reported that Rosner had told him he was not interested in meeting Leuci or getting information about his case, Leuci replied that this was "fine" with him.[9] Despite these preliminaries, Rosner did appear for a meeting with the other three on October 4.

After discussing the *Marcone* case for a while, it was Rosner who asked whether Leuci's "friend" would be able to help in Rosner's subornation case. It was Rosner who asked Leuci to get the "3500 material" and to find out which witnesses were "good" and which "bad." When Leuci stated his ignorance of what

"3500 material" meant, Rosner assured him that his "contact" would understand the term.[10] Rosner told Leuci that if his friend obtained the things requested by Rosner, there would be a lot more money for him in the future.

Later, on October 13, when Leuci told Rosner that he did not see why Rosner needed the Grand Jury minutes since he would get them eventually, and that they would cost an additional $1,000 or $1,500, it was Rosner who said that the Grand Jury minutes would be worth it to him, but that he must have them soon. Rosner also sought to determine whether his own client, Stewart, a witness in a separate case, was a Government informer.

■ The trial judge submitted the issue of entrapment to the jury and we find that his charge properly expounded the law on the subject.

The Supreme Court in United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) has reaffirmed the elements of entrapment that had been explained in two earlier cases, Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). The Supreme Court rejected the minority view which had been expressed in the earlier cases that even if the defendant had a predisposition to commit the crime, if the Government's conduct nevertheless fell below the standards of proper use of governmental power, entrapment could be found. The Supreme Court in *Russell, supra,* reaffirmed the majority view which Judge Bauman had followed in his charge. When the defendant sustains the burden of proving government inducement, the burden then is cast upon the Government to prove the defendant's predisposition to commit

---

9. Leuci may have been misleading DeStefano when he purported to be afraid of meeting Rosner, or he may have really feared that Rosner was smart enough to see through his cover. In either case, his language was not that of an entrapper thrusting opportunity on an unwary innocent.

10. At this meeting Leuci saw money pass from appellant to DeStefano who then passed $400 under the table. The jury acquitted appellant on Count 4 which charged the payment of this $400 as a bribe, as well as on Count 5 regarding a payment of $100 on October 8, 1971.

the crime beyond a reasonable doubt, but if predisposition is proved, the judgment of conviction will generally stand regardless of the Government's activity. United States v. Russell, *supra*. In this case the Court gave the jury appropriate instructions, both on inducement [11] and on predisposition.[12]

Appellant contends that leaving the issue of entrapment to the jury was not enough; that the Judge should have found entrapment as a matter of law. We disagree. There is not enough credible evidence, without the testimony of the appellant himself, to sustain the defense of entrapment. The trial court need not accept the defendant's version as true or take the question of his credibility from the jury. "The truth of the matter was for the jury to determine." Osborn v. United States, 385 U.S. 323, 331, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966); United States v. Braver, 450 F.2d 799, 803 (2 Cir. 1971), cert. denied, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). Judge Bauman properly gave the jury the appellant's contention

and the elements of entrapment. He left to the jury the credibility of the witnesses. *See* United States v. Cuomo, 479 F.2d 688, 691 (2 Cir. 1973).[13] They decided, on proper instructions, that the defense of entrapment did not stand up, and that predisposition had been proved beyond a reasonable doubt.

■■ We note, in passing, that we do not agree with appellant's premise that a man under indictment, simply because he is a defendant, has a larger claim than others to an entrapment defense when he attempts to bribe or to obstruct justice. Nor is proof of prior bribery a necessary requisite for a finding of predisposition. *See, e. g.,* United States v. Greenberg, 444 F.2d 369 (2 Cir.) cert. denied, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971); United States v. Haley, 452 F.2d 398 (8 Cir. 1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1205, 31 L. Ed.2d 253 (1972). That Rosner desired corrupt information in a number of cases tends further to establish his predisposition to obtain such information by unlawful means. Bribery is no more a

11. "The fact that the Government officials or their agents merely afford opportunities to one who is ready and willing to violate the law when the opportunity presents itself does not constitute entrapment. However, in their efforts to enforce the laws, Government officials and their agents may not entrap an innocent person who, except for the Government's inducement, would not have engaged in the criminal conduct charged.

"Entrapment occurs only when the criminal conduct was the product of the creative activity of the law enforcement officials or their agents, that is, if they initiate, incite, induce, persuade or lure an otherwise innocent person to commit a crime and to engage in criminal conduct. And if that occurs, the Government may not avail itself of the fruits of this instigation.

"In this regard, the defendant asserts that he was induced to violate the law by the activities of Leuci, a Government agent, both by Leuci's actions in direct discussions with him and also by Leuci's utilization of De-Stefano and Lamattina to apply pressure on him."

12. "Thus, if the prosecution has satisfied you beyond a reasonable doubt that the defendant was ready and willing to commit the offenses charged and merely was awaiting a

favorable opportunity to commit them, then you may find that the Government did no more than furnish a convenient opening for the criminal activity in which the defendant was prepared to engage. In such circumstances, you may find that the Government's agent has not seduced an innocent person but has only provided the means for the defendant to effectuate or realize his own then existing purposes.

"On the other hand, if you have a reasonable doubt that the defendant would have committed the offenses charged without the Government's inducement, then it is your duty to acquit him."

13. The trial judge reminded the jury of Rosner's testimony that he had been told that a friend of Lamattina's [Leuci] had said that "the United States Attorney's Office had information that Pedro Hernandez had been killed and that they were gathering evidence to establish that Rosner had had Hernandez killed . . . that the Government was going to ask the judge handling Rosner's pending case to imprison him . . . and that Felix Martinez, a client of Rosner's, was about to implicate Rosner in the fix of his, Martinez', narcotics case in Queens, and Rosner could expect to be indicted for that."

prerogative of the defendant himself than of his lawyer or agent. The coercion of external events may press hard on a defendant in a criminal case but makes no less culpable the acceptance of corrupt advice. This was not an extortion where the government agent purported to control the process of indictment or even of investigation. The entire subject was unlawfully obtained information and documentation, not action.

■ The argument that the agent supplied the means for the commission of the crime—the 3500 material and the grand jury minutes—and that this, in spite of predisposition, constitutes entrapment in law is untenable. United States v. Russell, *supra*. We have held legitimate the activities of agents passing as corrupt, because bribery, like narcotics dealing, is hard to detect except by infiltration, and Lamattina and De-Stefano were clearly corrupt people and proper targets. See United States v. Mascia, 447 F.2d 1111 (2 Cir. 1971), cert. denied, 404 U.S. 1025, 92 S.Ct. 675, 30 L.Ed.2d 675, reh. denied, 405 U.S. 969, 92 S.Ct. 1166, 31 L.Ed.2d 244 (1972); United States v. Greenberg, *supra*. Nor is there any valid claim that Leuci in his operations broke the law or committed crimes, *cf*. United States v. Archer, *supra*, 486 F.2d at 676; for the activity of the undercover agent here was not different in kind from the every day activity of the undercover agent in narcotics cases who lacks criminal intent because his intention is to expose rather than to commit crime.

■ Appellant also contends that the Court erred in refusing to charge Request No. 8, which reads:

"The defendant asserts that he was entrapped when he obtained the 3500 material and the grand jury minutes.

I charge you that although the grand jury minutes were obtained several days after the 3500 material, a separate independent inducement need not be shown as to the grand jury minutes, where their acquisition 'was part of a course of conduct which was the product of the initial inducement.' "

In the context of the case, there could have been no misapprehension by the jury on this score. The conspiracy count charged a conspiracy to violate 18 U.S.C. §§ 1503, 201(b), 641 and 2071, and that it was part of the conspiracy corruptly to impede the due administration of justice by unlawfully obtaining, in return for cash payments, certain documents, including transcripts of grand jury testimony and statements of prospective government witnesses in the then pending *Rosner I* case, and a draft copy of an indictment, yet to be voted, involving one Dominick J. Marcone.

The evidence showed a single continuous course of dealing and no one suggested that there was anything but a single continuing inducement.[14] The evidence showed that it was Rosner who insisted on getting the Grand Jury minutes promptly although Leuci did not see why he needed them in advance of trial. In the circumstances, giving the charge requested would have been confusing, even though in a proper case where a jury could find that a later crime occurred only after an earlier inducement had been dissipated, such an instruction might be given. See Sherman v. United States, 356 U.S. 369, 374, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

## IV.

### *Privacy of Legal Conferences.*

Appellant contends that Judge Bauman erred in denying his motion for a new trial because of intrusion by alleged

---

14. The instruction concerning inducement embraced the conception not only of committing a crime but also of engaging in "criminal conduct," and explained that "if that occurs, the Government may not avail itself of the fruits of this investigation." The Court, moreover, consistently referred to "the crimes charged" or "the offenses charged" in the plural, making it obvious that the alleged inducement was to be considered pervasive of the entire course of conduct.

Government agents into conferences between himself and his counsel, including his wife Nancy, who is a lawyer. Appellant asserts that the assumed intrusion invokes a *per se* rule which compels reversal of the judgment of conviction without any showing of prejudice to the defendant. Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), cert. denied, 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260, reh. denied, 349 U.S. 969, 75 S.Ct. 880, 99 L.Ed. 1290 (1955); *see* Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), and *see* Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

■■ The two persons described as "agents of the Government" by Rosner are DeStefano and Lamattina. Appellant asserts that the participation of these individuals in strategy conferences with Rosner's lawyers violated his Sixth Amendment right freely to consult his counsel without Governmental intrusion. We do not lightly regard so serious a constitutional claim, for the essence of the Sixth Amendment right is, indeed, privacy of communication with counsel. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We conclude, however, that a finding of unlawful intrusion must precede the determination of its consequences. We can make no such finding here. Judge Bauman, after hearing the witnesses, found to the contrary. Even if, on a constitutional issue, we would eschew reliance on the "clearly erroneous" test, see Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we are convinced, on our own review of the evidence, that the Government has sustained its contention beyond a reasonable doubt.[15]

Lamattina's alleged participation in the counsels of the defense was quite limited. The only time he appeared at a talk between Rosner and counsel was at a lunch discussion in Gassner's Restaurant after the Grand Jury appearance of the three prospective defendants in the instant case on June 30, 1972, before indictment. DeStefano's contacts with Rosner and his counsel were more frequent. Albert Krieger, who had been retained on June 17, 1972 as Rosner's trial counsel, recalled the participation of DeStefano only two or three times in conferences which Krieger attended. He recalled no pre-indictment conference except that of June 30. He recalled one conversation with Mr. and Mrs. Rosner, in which DeStefano participated, as having taken place in November, shortly before the trial. According to Mr. Krieger, DeStefano was told, among other things, that his taped conversations were "very heavy evidence" against him. He was asked whether he was going to plead guilty and was also asked to give some information that might help the entrapment defense. He was also asked for information to attack the credibility of Leuci.[16]

It is apparent that Krieger and Rosner knew even then of the distinct possibility that DeStefano might plead guilty. Indeed, Krieger stated that very possibility in open court on November 20, before the jury was selected. The defense team must have known that, in human experience, the pressure of imminent incarceration tends to snap the bonds of loyalty.

At any rate, Mr. Krieger apparently took the position that he was better off continuing to see DeStefano to ask him whether Lamattina would testify against

---

15. The trial judge conducted an extensive evidentiary hearing at which the prosecutors, the alleged informers and defense counsel testified.

16. Since DeStefano was represented by separate counsel it is not clear why DeStefano was asked questions and given advice without the presence of his own counsel. We assume that DeStefano's lawyer had no objection to this procedure.

Rosner and to find out what else Lamattina knew about Rosner. Krieger went to the extent of befriending DeStefano by making a bail application on his behalf on November 27 against the Government's efforts to remand him, as Krieger thought, "to put pressure on DeStefano", and avoided asking him certain questions for fear that "would just shut him off completely."

After DeStefano was, at long last, debriefed by the Government on November 24, he saw the defense team on November 27. But after the meeting with the defense team he did not see the prosecutors again until after the *Rosner* trial was over.

From the chronology of largely uncontested events it appears that from the time he agreed to cooperate in the *Rosner* case, DeStefano had no further contact with the Government, and, hence, there was no opportunity for prejudice.

After the debriefing of November 24, the Government should have told DeStefano not to go near the legal conferences of the defense, and we suggest that this be done in the future. We recognize, however, that the prosecutors had no reason to believe that he would do so after his plea of guilty had been made publicly, or that the defense would trust him if he did. DeStefano had been warned at the outset not to divulge anything to the prosecutors concerning the defense.[17] We have recently held that where there is no opportunity for prejudice, even governmental intrusion will not require reversal. United States v. Mosca, 475 F.2d 1052 (2 Cir. 1973); see also United States v. Zarzour, 432 F.2d 1 (5 Cir. 1970).

Appellant contends that he was prejudiced in his Sixth Amendment right, by the Government's use in his cross-examination of the *"Reardon Case."* An inference is sought to be drawn that De-Stefano learned about the *Reardon* case, in which Lamattina himself had been the arresting officer, from the legal discussions of the defense team, and that he had then prompted Lamattina to tell the prosecutors about it. The inference was not supported. The only lawyer who testified to any discussion of the *Reardon* case with DeStefano was Mr. Krieger, who testified that the case was discussed with DeStefano after Lamattina had already pleaded guilty. Krieger, who already knew about the *Reardon* case, asked DeStefano whether De-Stefano knew anything about the *Reardon* case, and whether Lamattina might use the case against Rosner. According to Krieger, DeStefano indicated that Lamattina had committed perjury in the *Reardon* case, that Rosner had discovered the perjury and that Lamattina had protected himself by not appearing in court and that this had resulted in a dismissal of the indictment. Krieger obviously could have obtained this information, or facts which were more incriminating, from Rosner himself. He was seeking information from De-Stefano which Rosner might not have, rather than seeking repetition of what DeStefano might have learned from Rosner. There is simply no proof in the record that DeStefano learned about the *Reardon* case from participating in the counsels of the defense rather than from his friend Lamattina or from Rosner at the time of its occurrence. Mr. Krieger placed the meeting as having taken place after he had made a bail application on behalf of DeStefano, which was on November 27. This was five days after the Government had already been told about the *Reardon* case. In any event, after the Krieger meeting described, DeStefano did not speak to the prosecutors again until after the trial.

The appellant relies on the circumstance that on December 20, 1971, when

---

17. In a waiver he was later asked to sign there was included the statement "Both Mr. Scoppetta and Mr. Morvillo have informed me that they will not discuss any of the facts of the trial or any possible defenses that I and my co-defendants [Rosner] may have to the charges." At the time De-Stefano had refused to sign the waiver. He later did sign.

upon their discovery that Leuci was a Government "plant," DeStefano and Lamattina were brought to the United States Attorney's office, they were told what the prosecutors had on them, and their "cooperation" was solicited. The evidence is clear that neither one, at the time, acquiesced in the Government suggestion.

There is neither contention nor proof that Lamattina or DeStefano were sham defendants who were indicted to lull a co-defendant by concealing an immunity already given. *Cf.* United States v. Rispo, 460 F.2d 965 (3 Cir. 1972); see United States v. Archer, *supra.* There is no question that when the Grand Jury indicted Lamattina and DeStefano with Rosner on July 7, 1972, the Government meant business and that Lamattina and DeStefano were quite aware of that.

Here we must pause to analyze the situation as it stood on December 20, 1971. The pair were targets of an investigation. Their "cooperation" could involve two aspects: They could implicate Rosner in the case at hand or in other cases; or they could stay faithful to Rosner and themselves in the case at hand, and cooperate with the Government in *other* matters, including active participation in current and future investigations. Assistant United States Attorney Shaw testified that they made it clear from the outset that they would not testify against Rosner or even give information about other dealings they had with Rosner. In fact, until the debriefing during the week of November 20, 1972, they gave no information about Rosner. Their limited cooperation in other matters, in the pre-indictment phase, was in no way related to appellant.

There is no evidence that the Government knew that DeStefano was seeing Rosner, Mrs. Rosner or other lawyers associated with the defense. While the pair were, for a time, helping the Government in certain respects, they were not general informers, and they had each specifically abjured the role of informer against Rosner. We think that this type of non-prejudicial "cooperation" falls short of inviting the application of a *per se* rule.[18]

Appellant contends, nevertheless, that when the United States Attorney *asked* for the cooperation of DeStefano and Lamattina, they should have been told at once not to participate in sessions with Rosner and his lawyers.[19]

The question is whether the prosecutor had any right to tell a prospective defendant not to engage in conferences with the attorneys for a co-defendant. The Sixth Amendment right of DeStefano and Lamattina, as well as that of appellant, had to be respected. The Government by merely proposing a cooperation that stands unaccepted cannot cut off the right of the offeree to pursue his own constitutional right to legal advice in his own defense. Each could contribute what he thought useful to the common defense, and glean what he might for his own defense. Neither had agreed to serve as a human recording device for the prosecution.

If the co-defendants were not intruding agents of the Government there was no constitutional restraint on their ultimately divulging what they had learned. There is, indeed, proof in this record that they actually did not divulge anything. An attorney and his client who meet freely with potential co-defendants in a criminal case always expose them-

---

18. Compare United States v. Edwards, 366 F.2d 853, 873 (2 Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967), where we recognized in the context of a *Massiah* (Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)) situation that a person may be involved in two "distinct and unrelated crimes." And see also United States v. DeSapio, 456 F.2d 644, 650 (2 Cir.), cert.

denied, 406 U.S. 933, 92 S.Ct. 1776, 32 L. Ed.2d 135 (1972).

19. We have been cited to only two cases in this area where multiple defendants were involved and where a co-defendant was the alleged eavesdropper. United States v. Mosca, *supra,* and United States v. Rispo, *supra.* In *Rispo* the informer was a sham defendant. We discuss *Mosca, infra.*

selves to the risk of a subsequent disloyalty by the co-defendant whom they might have been better advised to examine through his own attorney, without the risk of unwitting disclosure.[20] The attempted disclosure of the content of a joint conference of co-defendants with the lawyer of one of them may possibly give rise to a claim of privilege, see Proposed Rules of Evidence for the United States Court, Rule 503(b)(3), but the breach of a common law privilege, as such, is not necessarily of constitutional dimension. The constitutional barrier is raised when it is the Government that unlawfully intrudes on legal strategy conferences, as when it eavesdrops by electronic means, Black v. United States, *supra*, or when it "plants" a spy in the legal conference, Caldwell v. New Jersey, *supra*.

We do not reach the constitutional limitation here, for there is no reason to believe on this record that Lamattina or DeStefano, as we have traced their participation, were ever "planted" by the Government to discover defense secrets.

A *per se* rule must, in any event, be thought of in terms of sanction against the Government rather than as a search for truth. Illegal wiretapping may be so far beyond the bounds of governmental propriety that it is offensive to a rule of liberty under law. (Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).) The use of a dummy defendant, the ultimate in the chicanery of unlawful intrusion, is cut from the same cloth. See United States v. Archer, *supra*; United States v. Rispo, *supra*; United States v. Lusterino, 450 F.2d 572 (2 Cir. 1971). The intrusion by a paid informer for the

avowed purpose of listening to defense secrets is not different from planting an electronic listening device. Caldwell v. United States, *supra*.

In all such cases the Government has been treated as ruthless beyond justification. It has stooped to conduct well below the line of acceptability. These strictures, while legal principles in constitutional terms, are also moral judgments. They assess the guilt not of the defendant but of the Government. The Supreme Court in the *Hoffa* case, considered *Coplon, supra*, and *Caldwell, supra*, so strongly urged upon us by appellant, as cases which "dealt with government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel." Hoffa v. United States, *supra*, 385 U.S. at 306, 87 S.Ct. at 416. When the Government is found guilty of such a charge, the dereliction is more than the bungling of the constable, in Judge Cardozo's phrase. (People v. Defore, 242 N.Y. 13, 150 N.E. 585 (1926).) It is a corrupting practice which may justify freeing one guilty person to vindicate the rule of law for all others. See Mr. Justice Holmes dissenting in Olmstead v. United States, 277 U.S. 438, 469, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

When the Government is not found guilty of such avowed corrupting conduct, however, the rule must, of necessity, be different. *See* United States ex rel. Cooper v. Denno, 221 F.2d 626 (2 Cir.), cert. denied, 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289 (1955). There is then no need to punish the prosecutor by freeing the defendant. The matter must then proceed to an ultimate adjudication of whether the defendant was prejudiced

20. In a Fourth Amendment context, the Supreme Court noted that "he [Hoffa] was relying upon his misplaced confidence that Partin [the alleged informer] would not reveal his wrongdoing." See Hoffa v. United States, *supra*, 385 U.S. at 302, 87 S.Ct. at 413. And Mr. Justice Douglas, dissenting in the companion case of Osborn v. United States, 385 U.S. 323, 346, 347, 87 S.Ct. 429, 442 (1956), noted the difference between the Government being "the willing recipient of information supplied by a fickle friend" and where the Government has "participated in a breach of privacy by sending in an undercover agent." Of course, where an informer actually testifies and the Government suppresses his status as an informer, the case is quite different. *Cf.* United States v. Mele, 462 F.2d 918 (2 Cir. 1972).

in fact. We have recently followed this rationale in United States v. Mosca, *supra*.

A holding that the *per se* rule applied to this case would mean an ultimate dismissal of the indictment. If there was, indeed, intrusion there is nothing tangible to exclude from the new trial, for nothing tangible was admitted in the first trial. The appellant would then argue that he was without means to remedy such a pervasive defect, and that the alleged taint remains immutable, no matter how many trials to different juries. *See* State v. Cory, 382 P.2d 1019 (Sup.Ct., Wash.1963); Fusco v. Moses, 304 N.Y. 424, 107 N.E.2d 581 (1952).[21] If circumstances warranted it we would not shrink from such a result, *see* United States v. Archer, *supra*, but we do not find that such circumstances exist in this case.

The contention is made that since the United States Attorney in the *Biaggi* matter, 478 F.2d 489, conceded that it was not a crime for an attorney, not directly involved in the particular investigation, to make Grand Jury testimony available or for an investigative reporter to seek a copy of such testimony, the appellant committed no crime.

■ We have put no imprimatur on the United States Attorney's report. Nor do we acquiesce in the view that anyone, investigative reporter or counsel for a defendant, may poach on the secret preserve of the Grand Jury. The proceedings of the Grand Jury are secret by the prescription of history as well as by rule of procedure. (See VI Wigmore on Evidence §§ 1850–55, 1859(g) (3d ed., 1940).) A system under which a zealous corrupter may gain information, while his ethical fellow may not, would exact a high premium for corruption with no corresponding gain to the public interest or legitimate private right.

The *Archer* opinion is cited as suggesting reversal in this case. Treating respectfully the dicta of the *Archer*

panel concerning government activity in the creation of crime, we note that the activities in *Archer* were alleged corruption of a state official in connection with a purported state crime, the federal jurisdiction being attenuated to the point of contrived fiction. The activities of the federal agents, indeed, the whole concept, involved the *purported commission* of state crimes to lure the Assistant District Attorney there involved. In the instant case there was no *independent* crime, no perjury before a Grand Jury and no substantive criminal conduct as a step to ultimate enticement of the defendant.

*Impossibility of Success.*

■ The last argument is that the crimes of conspiracy, of endeavoring to obstruct justice and of bribery were not legally capable of attainment, since the Government knew what was going on all the time. Appellant cites United States v. Berrigan and McAllister, 482 F.2d 171 (3 Cir. 1973) in support. There the conviction of Father Berrigan and Sister McAllister for violation of 18 U.S.C. § 1791 and 28 C.F.R. § 6.1 by attempting to take something out of a federal penal institution "without the knowledge and consent of the warden" was reversed.

Appellant's citation is wide of the mark. The obstruction of justice statute, 18 U.S.C. § 1503, defines the offender as one who "endeavors"—not one who "attempts"—to influence an officer in the performance of his duty, or as one who "endeavors to influence, obstruct, or impede the due administration of justice." In Osborn v. United States, 385 U.S. 323, 332, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966), the Supreme Court said, "[w]hatever continuing validity the doctrine of 'impossibility', with all its subtleties, may continue to have in the law of criminal attempt, that body of law is inapplicable here. The statute [18 U.S.C. § 1503] under which the petitioner was convicted makes an offense

---

21. Mr. Justice Stewart noted the problem in Hoffa v. United States, *supra*, 385 U.S. at 307–308, 87 S.Ct. 408.

of any proscribed endeavor . . . . " [footnote omitted; citing United States v. Russell, 255 U.S. 138, 143, 41 S.Ct. 260, 65 L.Ed.2d 553].[22]

■ Conspiracy, of course, is an agreement plus an overt act, and the possibility of success has never been thought to be of its essence. (United States v. Kellerman, 431 F.2d 319 (2 Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970).) Bribery, as defined in 18 U.S.C. § 201(b), prohibits offering anything of value to a public official. We have said that "[s]ection 201(b) is violated even though the official offered the bribe is not corrupted, or the object of the bribe could not be attained . . . . " United States v. Jacobs, 431 F.2d 754, 759–760 (2 Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 reh. denied, 403 U.S. 912, 91 S.Ct. 2210, 29 L.Ed.2d 690 (1971).

For the foregoing reasons the conviction will be affirmed.

## V.

### The Sentencing Procedure.

The appellant contends that the procedure followed on his sentencing requires a remand for resentencing. We agree.

The sentencing judge received a memorandum from the United States Attorney's office, which the Probation Department did not screen or verify, consisting of sixteen closely typed pages and appendices, outlining alleged "possible misrepresentations, fraudulent conduct, lying, and unethical behavior" on the part of the appellant, involving at least seventeen events, the prosecution stating candidly that "it is impossible to prove all such events." *Cf.* United

States v. Pfingst, 477 F.2d 177, 192 (2 Cir. 1973), citing ABA Standards Relating to Probation § 2.3(ii)(B) and Commentary (1970), and *cf.* United States v. Weston, 448 F.2d 626 (9 Cir.), cert. denied, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1971).

The memorandum, which included hearsay, inferences and conclusions, remained *in camera* for over two months, through successive adjournments of sentence. On the morning of the actual sentencing, defense counsel was given the presentence report of the Probation Department, and the judge, of his own volition, also made known the existence of the prosecutor's memorandum. He stated that since "I am considering that" in connection with the sentence, defense counsel also should see it.

That morning when Mr. Krieger, chief defense counsel, was shown the prosecutor's memorandum, he asked for an adjournment so that he could have "an opportunity to answer them." Although defense counsel had had no time to review or possibly even to absorb seventeen separate incidents hitherto unfamiliar to him, the request for an adjournment of the sentence was denied. The Assistant United States Attorney then made a strong plea that "Mr. Rosner be dealt with in the harshest possible terms."

In Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), the Supreme Court held that an excessive severity of sentence within the statutory maximum is not reviewable, but that where the sentencing court seriously misreads the defendant's record and proceeds to sentence on false assumptions, the failure to supply counsel to the defendant makes the error one of constitutional magnitude.

---

**22.** This also dilutes appellant's argument that because Judge Wyatt authorized the Grand Jury minutes to be given to Leuci to give to Rosner, no crime could be committed by Rosner. In *Osborn*, two judges of the District Court had authorized the planting of an electronic listening device to record conversations between the petitioner and the undisclosed Government informer.

Here the defendant did have able and conscientious counsel, but unless counsel was given adequate opportunity to correct any misinformation in the prosecutor's memorandum, we doubt that his spontaneous comment before sentence was adequate to afford the defendant his due. See United States v. Picard, 464 F.2d 215, 220 (1 Cir. 1972); United States v. Hone, 456 F.2d 495, 496 (6 Cir. 1972). We do not treat a violation of Fed.R.Crim.P. 32(a), such as is here alleged, as necessarily one of due process. See Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) and United States v. Fischer, 381 F.2d 509 (2 Cir. 1967), cert. denied, 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185 (1968) [cases of collateral attack], United States v. Malcolm, 432 F.2d 809, 818 (2 Cir. 1970). But we think that Rule 32(a) must be fairly read to give the defendant not only the right "to make a statement on his own behalf" but, in this context, also "to present any information in mitigation of punishment." Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961).[23]

The manner of rebutting hearsay assertions in a presentence probation report must generally rest in the informed discretion of the sentencing judge. The tender of such proof does not mandate an evidentiary hearing. See Williams v. New York, 337 U.S. 241, 246–257, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); United States v. Needles, 472 F.2d 652, 657–658 (2 Cir. 1973); United States v. Malcolm, supra, 432 F.2d at 816. On the other hand, where the presentence report is furnished to the defendant pursuant to the permissive provision of Rule 32(c), the defendant

should have the opportunity, if the factual background is erroneous, to inform the Court about the alleged misinformation. See United States v. Virga, 426 F.2d 1320, 1323 (2 Cir. 1970), cert. denied, 402 U.S. 930, 91 S.Ct. 1530, 28 L.Ed.2d 864 (1971). Normally, verbal explanation or comment is sufficient. United ed States v. Carden, 428 F.2d 1116, 1118 (8 Cir. 1970).

In the case at bar, we are dealing not only with a report by the Probation Department in which confidentiality of source may prove a serious consideration in particular cases, see Baker v. United States, 388 F.2d 931 (4 Cir. 1968), but also with a report of accumulated conclusions and hearsay of Assistant United States Attorneys presented by the prosecuting staff, which accompanied it orally by an adversary plea for a maximum sentence. We doubt neither the good faith of the United States Attorney's office, which understandably reacted sharply to a covert attempt to corrupt it, nor the ability of the able trial judge to separate the wheat from the chaff. But we think this winnowing should have been done only after "affording an opportunity to answer or explain," see United ed States v. Brown, 470 F.2d 285, 288 (2 Cir. 1972), by means short of an evidentiary hearing but not in "a niggardly fashion." See United States v. Fischer, supra, 381 F.2d, at 512. See also ABA Project on Minimum Standards for Criminal Justice: Standards Relating to Sentencing Alternatives and Procedures § 513(F)(iii)(A), concerning the duty of defense counsel "to controvert any inaccuracies in the [pre-sentence] report;" and see Notes, Advisory Committee on Rules, Fed.R.Crim.P. 32(c) (2), 18 U.S.C.A.[24]

---

23. Rule 32(a) reads as follows:
"Sentence shall be imposed without unreasonable delay. Pending sentence the court may commit the defendant or continue or alter the bail. Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment."

24. It is hoped that courts will make increasing use of their discretion to disclose, so that defendants generally may be given full opportunity to rebut or explain facts in presentence reports which will be material factors in determining sentences.

■ We recognize that the District Judge was justified in not tendering the report in advance of sentence because the pre-sentence report had not been asked for. When it was tendered, however, not enough time was given for reply in the light of the diverse accusations made. This Court has said that "it would have been preferable for the court to have revealed its contents [the pre-sentence report] to defendant far enough in advance of sentencing to give him an opportunity to counter them." United States v. Holder, 412 F.2d 212, 215 (2 Cir. 1969). In the *Holder* case, vacation of sentence was deemed unnecessary. But we are now confronted, not with a neutral presentence report, but with the adversary "memorandum" previously described.[25]

■ We commend the District Judge for disclosing the United States Attorney's report to defense counsel, *see* United States v. Trice, 412 F.2d 209 (6 Cir. 1969); United States v. Solomon, 422 F.2d 1110 (7 Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565, reh. denied, 400 U.S. 855, 91 S.Ct. 26, 27 L.Ed.2d 93 (1970), but we feel that he should have given counsel sufficient time for useful examination and rebuttal in view of the one-sided and potentially devastating disclosures of asserted bad conduct by the defendant.[26] *Audi alteram partem* is an ancient principle of justice, not impervious to exception for confidentiality, yet a fair general rule to apply, we think, before a judge finishes the profound soliloquy that precedes a just sentence.

It is the combination of factors here that we think made the procedure wanting. The report was by the prosecutor, not a professional neutral; it was retained by the judge *in camera* for two months before the sentence; it was shown to defense counsel only on the morning of the sentencing; a timely request for a continuance to contradict the report was denied.

We are of the opinion that a proper reading of the scope of Fed.R.Cr.P. 32 in the unusual circumstances of this case, compels a remand for resentencing. The resentencing should be done by another judge. On the facts of this case we adopt the rationale of the First Circuit, "[i]t is difficult for a judge, having once made up his mind, to resentence a defendant, and both for the judge's sake, and the appearance of justice, we remand this case to be redrawn." See Mawson v. United States, 463 F.2d 29 (1 Cir. 1972).

In resentencing, the judge redrawn will either not consider the prosecutor's report, or if he deems it desirable to read it, will afford a reasonable opportunity, in advance of sentencing, to defense counsel to attempt to refute its accusations. We do not, however, order an evidentiary hearing. Williams v. New York, *supra*.[27] Nor do we make any suggestion regarding the appropriate sentence.

The conviction is affirmed; the sentence is vacated and the case is remanded for resentencing in conformity with this opinion.

25. We need not go as far as the First Circuit did in Haller v. Robbins, 409 F.2d 857, 859 (1 Cir. 1969) and yet agree with its comment relating to an *ex parte* report to the sentencing judge. "[H]owever impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case."

26. The Seventh Circuit has made it a rule that District Judges who receive a report from the prosecutor must disclose its contents to defense counsel. United States v. Solomon, *supra*, 422 F.2d at 1121. As a panel, we make no such rule but commend its spirit to our colleagues of the trial bench.

27. We do not accept the suggestion of amicus that the prosecution memorandum itself should not, as a matter of law, be seen by the sentencing judge.