**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Judith Tomlinson BULLOCK, Defendant-
Appellant.**

**No. 29744.**

United States Court of Appeals,
Fifth Circuit.

April 22, 1971.

Floyd M. Buford, Macon, Ga., court appointed for defendant-appellant.

William J. Schloth, U. S. Atty., D. L. Rampey, Jr., Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

The jury found the defendant-appellant guilty on each count of a two-count indictment returned against her and a co-defendant, Roy Rodriguez, Jr., who was not tried. The first count charged them with passing and uttering a forged United States money order, knowing the money order to have been forged, in violation of 18 U.S.C. § 500. The second count charged them with retaining eleven stolen money orders having a value in excess of $100.00 with the intent to convert same to their own use and knowing the money orders to have been stolen, in violation of 18 U.S.C. § 641. The court sentenced her to imprisonment for

a period of five years on each count, the sentences to run concurrently.

Appellant's able court-appointed counsel urges four grounds for reversal, *viz.*: that the district court erred (1) in denying her motion to suppress the money orders and other property seized as a result of her arrest, (2) in denying her motion for judgment of acquittal, (3) in denying her motion for a mistrial, and (4) in failing properly to instruct the jury. We find no reversible error and affirm the judgment of conviction.

At about 12:50 P.M. on October 30, 1969, Miss Bullock entered the main post office in Macon, Georgia, and presented to the postal clerk for cashing a money order in the amount of $100.00. Following the usual procedure, the clerk asked for identification. The money order was made payable to Mary Bruni and Miss Bullock presented a driver's license bearing that name. Each week the Post Office Department furnishes its money order clerks with an up-to-date list of stolen money orders. Upon checking the number on this money order against his list of stolen money orders, the clerk discovered that it was included in that list. He excused himself from Miss Bullock, saying that he would be "back in a minute," or words to that effect, and took the money order and the driver's license to a superintendent of window service some 40 feet distant. The superintendent verified the fact that the number on the money order was included in the list of stolen money orders and called the Postal Inspector, Mr. Wayne Hudson. Mr. Hudson promptly came downstairs from his office on the second floor, examined the money order, the list of stolen money orders, and the driver's license and found that the number on the money order was included in the list of stolen money orders.

The money order was completed in the amount of $100.00 payable to Mary Bruni; it was postmarked Orlando, Florida, Azalea Park Branch, October 15, 1969, and was completed to show the purchaser as J. L. Bruni, 192 North Street, Orlando, Florida. One day earlier, Mr. Hudson had received a notice from the postal inspector in charge in the Atlanta Office describing particulars relating to a burglary of the Azalea Park Branch of the Orlando, Florida, Post Office, which had occurred on the night of October 19, 1969. That notice disclosed as a part of the Government loss in the burglary a list of the same stolen money orders.

According to the postal clerk, his investigation and the conversation between himself, the superintendent of window service and Inspector Hudson had consumed only about two or three minutes. During that time Miss Bullock was standing at the window apparently calm and awaiting the return of the clerk with the money order and driver's license. Shortly after Inspector Hudson appeared on the first floor, Miss Bullock left the service window and walked hurriedly toward an exit leading to a parking lot. Inspector Hudson quickened his pace and caught up with her but failed immediately to identify himself as a postal inspector. He asked her to come with him, saying that he wanted to talk with her; at which time "she politely told me that she was going nowhere with me." Inspector Hudson then "told her that I was Inspector Hudson and she was under arrest and I grabbed her by the left wrist applying enough pressure to be sure that she did not depart." Miss Bullock then accompanied Mr. Hudson to his office on the second floor. Mr. Hudson informed her that she was under arrest for attempting to pass a stolen postal money order. On searching her purse, Mr. Hudson found ten additional money orders, the numbers of which were included in the list of money orders stolen from the Azalea Park Branch. He found also two credit cards issued to Joseph L. Bruni by "Enco" and by Sears Roebuck and a third credit card issued to Mrs. Mary Bruni by Bay Bank and Trust Company. Miss Bullock had objected to the search of her purse, saying that she wanted to talk to her attorney. The search revealed no pistol, knife or

weapon of any kind. The foregoing was substantially the testimony introduced both on the hearing of the motion to suppress and, the court having overruled that motion, at the beginning of the trial before the jury.

In addition, at the close of the Government's direct examination of Inspector Hudson, the testimony was introduced which formed the basis of the motion for a mistrial, ground number three of the four grounds urged for reversal. Because in our opinion that ground comes nearer to justifying a reversal than any of the other three, when we come to consider the motion for mistrial we will quote that testimony in extenso and will also state at some length the testimony taken on the motion in the absence of the jury.

In further testimony before the jury, another postal inspector (Ritchie) testified that he had occasion to investigate the burglary of or theft from the Azalea Park Branch Post Office of Orlando, Florida; that he made the inventory of the money orders which had been stolen from that post office on October 19, 1969; that the eleven money orders introduced in evidence in this case fall within the group that was missing after the burglary of the Azalea Park Branch Post Office; that all of the equipment necessary for preparing money orders for cashing was also stolen from that branch post office; that a total of 400 postal money orders were missing and the eleven here involved are part of that 400. Similar testimony was given by the superintendent of the Azalea Park Branch Post Office.

Mrs. Mary V. Bruni testified that she lived in Holiday, Florida; that on the morning of October 10, 1969, while she and some friends were bathing in the beach, her purse was stolen from her automobile. Mrs. Bruni further testified that the credit cards which Inspector Hudson found in Miss Bullock's purse had been in Mrs. Bruni's purse which had been stolen. Mrs. Bruni did not identify as hers the driver's license which Miss Bullock had presented to the postal clerk, but a Trooper from the Florida Highway Patrol testified that the driver's license, purporting to be issued to a Mary V. Bruni of the age stated on that license, had never in fact been issued by the Florida Department of Highway Safety.

At the close of the Government's evidence, the defendant moved for a judgment of acquittal and that motion having been denied, Miss Bullock took the stand and testified in her own behalf, substantially as follows: She was 26 years old, had resided in Tampa, Florida, for the last three years and two or three months; just before coming to Macon, Georgia, she had made a trip from Tampa, Florida, to New Orleans, Louisiana, where she had stayed at the Roosevelt Hotel with Roy Rodriguez, Jr.; she was in love with Roy Rodriguez and they had come to New Orleans to be able to be together; before leaving Tampa, she had occasion to meet another male friend, John Self, in the Sportsman's Club; John Self asked her if she would carry a package to New Orleans for him and that he would get in touch with her at the Roosevelt Hotel; it was just a small package in a brown paper bag; John Self led her to believe it was money because he told her, "If I got in a tight or jam of any kind, just to use what was in the bag"; when she left Mr. Self at the Sportsman's Club and went on to her home in Tampa, she got curious, opened the bag and found the money orders, a driver's license apparently issued to Mary Bruni and some credit cards; she and Roy Rodriguez then decided to use the names Joseph Bruni and Mary Bruni solely because Rodriguez was a married man and they did not "want to risk his wife finding out"; she did not know that the money order which she presented for cashing was a forged money order and had no knowledge of any theft or stealing; she estimated that she waited at the postal clerk's window for anywhere from twelve to fifteen minutes before

deciding to leave the window; she does not know where John Self is and has not heard further from him; she is not guilty of the charges in the indictment.

At the close of all the evidence, Miss Bullock's counsel renewed his motion for a judgment of acquittal which was denied. He also reserved a number of objections to the court's charge to the jury.

We consider in order the four grounds urged for reversal.

### 1. *Motion to Suppress.*

■ The motion to suppress was based on the contention that Inspector Hudson had no probable cause to arrest Miss Bullock. He knew that the money order which she had presented for cashing appeared on the official list of stolen money orders. He had notice that the Azalea Branch Post Office which appeared to have issued that money order had been burglarized eleven days earlier and that 400 money orders including the one presented for cashing had been stolen. He saw Miss Bullock, apparently abandoning the one-hundred dollar money order and the Florida driver's license, and walking hurriedly toward the exit leading to a parking lot. He had no alternative but to place her under arrest.

> "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790]."

Brinegar v. United States, 1949, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879.

Clearly Inspector Hudson had probable cause to arrest Miss Bullock, and the search of her purse following that arrest was a legal search. The motion to suppress was properly denied.

### 2. *Motion for Judgment of Acquittal.*

The full statement of the evidence already made renders it superfluous to discuss the denial of the defendant's motion for judgment of acquittal. The evidence of her guilt was almost overwhelming.

### 3. *Motion for Mistrial.*

■ As has been indicated, the most substantial ground urged for reversal is the denial of the defendant's motion for a mistrial. The basis for that motion was the following testimony at the close of the Government's direct examination of Inspector Hudson:

"Q. All right. Now, subsequent to the Commissioner's hearing, can you tell me whether or not on that same day you heard anything from the defendant that would indicate that that statement that she made about her name not being Judy was untrue?

"A. Yes sir, I did.

"Q. Tell me about that.

"A. Immediately following the Commissioner's hearing, Mr. Bailey, the Deputy U.S. Marshal, took Mrs. Bullock to his office. When I walked into the office she was using the telephone.

"Q. Do you know who she was calling?

"A. I have no idea.

"Q. Tell me what she said exactly.

"A. She made a statement to someone—well, it was really a question—she said, 'Do you know who this is?' And then there was a pause and then she said—I thought she said, 'That's right. I'm Gene Gordon's client.' Then there was another pause.

"Q. And then what did she say?

"A. She said, 'I'm in jail in Macon, Georgia. I need some money, clothes and legal representation.'

"Q. All right, sir. Did she say anything else?

"A. Following that she turned her back to me.

"Q. Did she know you were in the office?

"A. She did, yes sir. And she dropped her voice to some degree, but I could still understand what she said. And she said, 'They knew my real name in twenty minutes.'

"Q. That's exactly what she said?

"A. Yes sir, that's verbatim.

"Q. All right, sir. 'They knew my real name in twenty minutes'?

"A. That's right.

"Q. Did she say anything else?

"A. She said several other things, and one thing she said was just before she hung up. She said, 'Get hold of you know who and tell him that the stuff is hot.'

"Q. To do what?

"A. 'Get hold of you know who and tell him that the stuff is hot.'

"MR. BUFORD: Now, if Your Honor please, I have a motion I would like to make outside of the presence of the jury in view of the nature of the motion.

"THE COURT: Very well, let the jury return to the room." [Record pp. 95, 96.]

After the jury retired, defendant's appointed counsel moved for a mistrial and urged the court that it would be impossible for Miss Bullock to get a fair and impartial trial in view of Mr. Hudson's testimony which he claimed was the result of Hudson's eavesdropping on her telephone conversation with her lawyer. In support of her motion for a mistrial, and for that purpose alone, Miss Bullock took the stand and testified substantially as follows: When Inspector Hudson arrested her at the post office in Macon, Georgia, on October 30, 1969, she asked permission to make a phone call to her attorney and he replied, "No, not at this time." Later, after the hearing before the Commissioner and after she had been fingerprinted, she received permission to make a phone call. Deputy Marshal Charles Bailey gave her permission to use the phone in the Marshal's office.

Miss Bullock testified that she requested privacy so that she could talk with her attorney. Actually, however, Mr. Bailey and a Mrs. Lowe, who works in the Marshal's office, were present at the time and Mr. Hudson came into the room while she was using the phone. Miss Bullock testified that she knew "they were in earshot" but "I was talking low on the phone and I don't see how anyone could have possibly heard me." The Court inquired from Inspector Hudson, "Mr. Hudson, did you know she was talking to a lawyer?" and Hudson replied, "Not at that time, no sir." [R. 108] The Court then called Deputy Marshal Charles Bailey to the stand. Mr. Bailey testified that he gave the defendant permission to use the phone but that he did not know who she called. "Well, it seems like to me she just asked me if she could make a phone call. I don't recall her stating that she was going to call a lawyer." [R. 110] Mr. Bailey also heard the defendant say to the person to whom she was talking, "I have not told them a thing and they knew what my name was within 20 minutes." That was all of the conversation that Mr. Bailey remembered. Mr. Bailey further testified on being questioned by the Court:

"THE COURT: Do you know whether she tried to get any one person and couldn't get them and then got another one or anything of that kind?

"A. Seems like to me that she did call one number and couldn't get anybody and then she called somebody else. But I don't know who it was. Could I say one thing?

"THE COURT: Yes sir.

"A. She came over to the office two or three times and there was always a bunch of phone calls made and that's the reason I'm a little confused as to how many she made at this time. Now, she's made numerous phone calls. I have been in her presence, from the jail, from the Marshal's Office, from the hospital. As far as we have been

concerned, she has never been restricted from using the phone.

"THE COURT: She has been in custody since she was arrested?

"A. Yes sir." [Record p. 112]

■ We find that the evidence does show that Miss Bullock requested permission to telephone her attorney by about 1:00 P.M., within about ten minutes after her arrest, but that she was not permitted to use the telephone until about 5:00 P.M., after she had reached the Marshal's office following the Commissioner's hearing. Such an unusual delay should not be condoned.

Nonetheless, there is and in this case there can be no contention that the absence of assistance of counsel at the Commissioner's hearing prejudiced the defendant on final trial. See Shelton v. United States, 1965, 120 U.S.App.D.C. 65, 343 F.2d 347, cert. denied, 382 U.S. 856, 86 S.Ct. 108, 15 L.Ed.2d 93; Rule 5(b), Fed.R.Crim.P.

Inspector Hudson had testified to only two significant statements made by Miss Bullock over the telephone: "They knew my real name in twenty minutes," and "get hold of you know who and tell him that the stuff is hot." Other evidence in the case proved without dispute that in seeking to pass the money order Miss Bullock was using an assumed name, Mary Bruni, and further that the money order presented for payment and the ten others found in Miss Bullock's purse were in fact stolen. The possibility of prejudice to the defendant from either of the statements to which Hudson testified is extremely slight.

■ In urging that the defendant was deprived of her Sixth Amendment right to counsel because Inspector Hudson and Deputy Marshal Bailey eavesdropped on her conversation with her attorney and that thereafter supposedly incriminating statements made by her were introduced in evidence, principal reliance is placed on Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. That case would be an apt precedent if

in fact Hudson and Bailey knew that Miss Bullock was talking with her attorney. Both testified positively that they had no such knowledge, and their credibility was primarily for the district judge who had the opportunity of seeing and hearing them testify.

Appellant's counsel couches his statement of this third ground in the following terms: "The trial court committed error in allowing testimony of federal agents who eavesdropped on telephone conversation of appellant with her attorney while she was in custody." Upon this record that is not the question. Instead, the objection of the defendant's counsel was delayed until the district court was faced with the hard choice of granting or denying the drastic remedy of a mistrial. Defendant's counsel had ample opportunity to object before either of Miss Bullock's supposedly incriminating statements had been repeated to the jury by Inspector Hudson. That becomes obvious upon a careful reading of the part of Hudson's testimony, heretofore quoted, which forms the basis for the motion for mistrial.

We find pertinent Mr. Justice Frankfurter's statement for the Court in Nardone v. United States, 1939, 308 U.S. 338, 341, 342, 60 S.Ct. 266, 268, 84 L.Ed 307:

"Dispatch in the trial of criminal causes is essential in bringing crime to book. Therefore, timely steps must be taken to secure judicial determination of claims of illegality on the part of agents of the Government in obtaining testimony."

Objection to the evidence should have been made promptly by counsel. See 28 C.J.S. Criminal Law § 1061. As said by Judge James M. Carter for the Ninth Circuit in United States v. Lazarus, 1970, 425 F.2d 638, 641, cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108, "Counsel cannot thus withhold objection to testimony and thereafter seek a mistrial based upon its introduction."

Under all of the circumstances of the present case, we cannot hold that the dis-

trict court erred in denying the defendant's motion for a mistrial.

4. *Instructions to the Jury.*

We have carefully read and considered this entire record, including the court's charge to the jury and each of the instructions and failures to instruct to which the defendant objected, and we find no reversible error. It would unduly prolong this opinion to discuss the instructions as length and would serve no good purpose. The judgment is

Affirmed.