**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Walter SCOTT,
Defendant-Appellant.**

No. 74–2302.

United States Court of Appeals,
Ninth Circuit.

June 18, 1975.

Rehearing Denied Sept. 25, 1975.

John J. Matonis (argued), Washington, D.C., for defendant-appellant.

James H. Jeffries, Atty. (argued), Dept. of Justice, Washington, D.C., for plaintiff-appellee.

## OPINION

Before BROWNING and TRASK, Circuit Judges and WILLIAMS,* District Judge

TRASK, Circuit Judge:

Scott was convicted after a jury trial in district court of failure to file income tax returns for the years 1969, 1970, 1971 and 1972 in violation of 26 U.S.C. § 7203. He was sentenced to 1 year on each count, the sentences to run concurrently. This appeal is from the conviction and from the trial court's denial of motions for arrest of judgment, and for a new trial. Scott, who is not an attorney, represented himself at trial but had counsel for his post-trial motions and on appeal.

Appellant styles himself a "national tax resistance leader."[1] He admitted at trial that he had not filed the returns but argued that, since his failure was based on his constitutional beliefs and his reading of various Supreme Court

---

* Honorable Spencer Williams, United States District Judge for the Northern District of California, sitting by designation.

1. He was National Chairman of an organization called the "Tax Rebellion Committee," which advocated resistance to the Internal Revenue laws by refusing to file any income tax returns or by filing blank ones.

cases, his failure was not willful within the meaning of the statute.

Two main issues are presented for decision by this court. The first involves the presence of a government agent in appellant's defense group at trial. The second is whether appellant was impermissibly singled out for prosecution by the government.

During much of the trial an undercover agent of the Internal Revenue Service was present among a group of fellow tax resisters who were aiding in the preparation of Scott's defense. The agent, James Swanson, alias Jeff Swan, was an officer in the Illinois Tax Rebellion Committee. According to his affidavit he was invited to travel to the trial by another tax protester from Indiana. He was given permission by his Internal Revenue Service superior and arrived in Fresno, California shortly after the trial began. His stated mission in attending the trial was to meet tax protesters and sympathizers and to advise his superiors of any planned violent or illegal activity. Swanson was present in the courtroom at the trial and at meetings held in a motel each day after the court sessions. He had received instructions from the Internal Revenue Service counsel in Chicago not to interfere in any way with the defense in Scott's trial. Swanson specifically denied in his affidavit that he had at any time offered any advice to Scott or his advisors as to how he or they should proceed in the defense of the case. He also specifically denied that he had engaged in electronic eavesdropping of any kind or had caused anyone else to do so, or that he had attempted to influence jurors or made any bomb threats. There was no evidence presented to the district court, nor here, that any information was passed by the agent to the prosecution except for one incident. Swanson reported to the prosecution that he had learned that members of Scott's party had illegally inserted material into a government exhibit. This was later the basis for separate criminal charges.

After trial Scott moved for arrest of judgment and a new trial based in part on the alleged activities of the agent. Scott claimed that the agent interfered with his defense by burglarizing his trial headquarters, attempting to influence the jury by riding on the elevator at the court house with them and making prejudicial remarks about Scott, engaging in electronic surveillance, making a bomb threat on the court house to adversely influence the jury, and lying to and misleading Scott to his detriment. This motion was supported by affidavits of those who had accompanied Scott at the trial. These affidavits, however, did not substantiate the above allegations in any direct manner, but rather were posed in terms of speculation that the agent might have had the opportunity to purloin Xerox copies of cases and instructions used by the defense. Only one contained a positive statement and that was that the agent had counseled Scott to testify on his own behalf. The agent's affidavit countered each allegation of the motion with a denial. The district court, ruling on the basis of the affidavits and his observations as the trial judge, denied the motions.

Appellant argues strenuously that the presence of Swanson among the group planning his defense and assisting him poisoned the entire proceeding and requires an outright reversal and dismissal or at the very least, a remand for a new trial. Specifically he relies upon the fourth, fifth and sixth amendments as the constitutional predicates for his arguments.

■ Looking first at the fourth amendment, we note that Swanson was not a witness at the trial and that no contention is made that he obtained any documents or evidentiary material which was introduced at the trial, whether helpful or harmful. There was therefore no illegal search for verbal evidence within the exclusionary rule, no unlawful seizure of documents presented in court and no violation of the fourth amendment. *Hoffa v. United States,* 385 U.S.

293, 300–03, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

■ Neither does the fact of Swanson's presence during conversations regarding trial strategy violate appellant's fourth amendment rights. Swanson was present because he was a member and official of the Tax Rebellion group and accepted as such albeit he was also an undercover agent of the Internal Revenue Service. In this regard, the Supreme Court quoted with approval in *Hoffa*:

> " 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.' " 385 U.S. at 303, 87 S.Ct. at 414. *Quoting, Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (dissenting opinion).

We find no merit to the fourth amendment claims.

Other than to list it, the appellant again does not particularize the basis upon which he claims the shelter of the fifth amendment. He does assert that Swanson urged him to take the witness stand and that the Internal Revenue Service so grossly intruded in the defense strategy conferences that the fifth and sixth amendments were violated. The principal cases relied upon are *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), and *Coplon v. United States,* 89 U.S.App.D.C. 103, 191 F.2d 749 (1951). In *Caldwell* the prosecution had hired Bradley as an undercover agent. As such he became intimately acquainted with the accused and his attorney. He was solicited by the accused and his counsel to work for them in the preparation of the case for trial. He attended conferences between counsel for the accused and witnesses and lawyers. The court held that this invidious intrusion denied the defendant of his right to effective assistance of counsel under the fifth and sixth amendments and actual prejudice need not be shown. *Coplon* was a case of intercepted telephone conversations between Judith Coplon and her attorney both before and during her trial on espionage charges. The court held that a hearing should be conducted and that if the interceptions occurred a new trial should be granted.[2]

In both of these cases, as well as in *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), and *Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966), there was an interference with the confidential relationship between the accused and his employed counsel regarding the impending trial and the trial itself. Here, on the contrary, appellant had waived or renounced his right to counsel and prepared for trial and tried the case without an attorney. He apparently had enlisted the assistance of a group of fellow tax resisters to help him in his own defense. Others from the tax rebellion ranks who appeared, joined in the meetings held during the trial.[3]

■ Appellant asserts that where the sixth amendment to the Constitution states that the accused shall have the right ". . . to have the Assistance of Counsel for his defense" it means not only counsel in the sense of an attorney

---

2. The court observed that the evidence introduced against her to sustain her conviction was from eye witnesses, documents properly obtained from her and her own statements. Therefore, concluded the court, the trial court did not err in denying the motion for new trial insofar as it was based on the theory that the government's proof was obtained by wiretapping or arose from leads obtained in that manner. 191 F.2d at 757.

3. Affidavits indicate that Vaughn Ellsworth, Miss Claire Kelley and William Drexler (none of them an attorney) sat at counsel table with Scott with the court's permission, but were not permitted to make objections or comments during the trial. Swanson, the treasurer of the Illinois Tax Rebellion Committee, attended with one Bill Dobslaw, a tax protester from South Bend, Indiana. Swanson arrived during the trial, met other protesters and was invited to be present at various informal gatherings, discussions and meetings which took place usually at the close of trial each day.

admitted to practice law but, also, that if he eschews an attorney, he may have his friends advise him. Therefore, he argues that interference with the relationship between the accused and his advisors carries the same sixth amendment proscription as interference between attorney and client. No cases are cited for that proposition and we have found none. On the contrary, the relationship between lawyer and client does carry a different set of rights and responsibilities than that between an individual and his friends. Other relationships recognized by the law, either statutory law or common law, likewise carry particular rights and responsibilities, e. g., husband and wife; doctor and patient; priest and confessor. Appellant's reliance upon *Hoffa* to bring his friends within the definition of "counsel" for sixth amendment purposes is not well placed. In discussing *Coplon* and *Caldwell* (where the intrusion *was* between attorney and client) the *Hoffa* Court hypothesized that there could be an intrusion so grossly prejudicial that even a new trial would be impermissible. The Court continued, however, by saying that the *Hoffa* case did not remotely approach such a situation.

> "This is so because of the clinching basic fact in the present case that none of the petitioner's incriminating statements which Partin heard were made in the presence of counsel, in the hearing of counsel, or in connection in any way with the legitimate defense of the Test Fleet prosecution. The petitioner's statements related to the commission of a quite separate offense—attempted bribery of jurors—and the statements were made to Partin out of the presence of any lawyers." 385 U.S. at 308, 87 S.Ct. at 416.

There is certainly nothing in the Court's discussion that would indicate it intended to enlarge the sixth amendment protection to a *pro se* defendant and his friends. Even where it properly applies as between lawyer and counsel, the majority of the courts have refused to apply a *per se* rule requiring reversal when the government has had access to communications between a defendant and his counsel. *E. g., United States v. Rosner,* 485 F.2d 1213, 1227–28 (2d Cir. 1973), *cert. denied* (without prejudice), 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Brown,* 484 F.2d 418, 424–25 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *Taglianetti v. United States,* 398 F.2d 558, 569–71 (1st Cir. 1968), *aff'd,* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). *See also United States v. Rispo,* 460 F.2d 965, 975–77 (3d Cir. 1972); *United States v. Bullock,* 441 F.2d 59 (5th Cir. 1971); *United States v. Alderisio,* 424 F.2d 20 (10th Cir. 1970). *But see South Dakota v. Long,* 465 F.2d 65, 72 (8th Cir. 1972), *cert. denied,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973). The courts in *Rosner, Brown* and *Taglianetti* all considered the Supreme Court cases of *O'Brien, Hoffa* and *Black,* and concluded that they did not require a *per se* rule. We agree.

On the unique facts of this case we find that appellant suffered no prejudice from the mere fact of the government's limited intrusion into the defense group of appellant and his friends. Appellant's defense in this case was an open book. He admitted not filing the returns and based his defense on his own novel theories of law. For example, he claimed that the sixteenth amendment authorizing the income tax was not properly ratified, that federal reserve notes are not legal tender and therefore he did not have to report them as income, and that he did not have to file tax returns if he felt that they would incriminate him. Scott advanced these theories to support his defense of lack of specific intent to commit the offense of willfully failing to file income tax returns. He claimed that, since he honestly thought that he was not legally bound to file returns, he could not be convicted.[4] It is

---

4. For the year 1969 Scott filed an individual return containing only his name, address, the date and a handwritten notation, "Under protest I plead the 5th Amendment to the U.S.

difficult to envision, on the facts of this case, how Scott could have been prejudiced by the presence of the government agent among the friends of the defense. Further, there is no evidence in the record to refute the affidavit of the agent that he passed no information about the defense to the prosecution.

This is not to say that government intrusion into the private councils of a *pro se* defendant, struggling to oppose that government during a trial, for the purpose or with the result of gaining trial advantages, is something to be lightly regarded. It is inconceivable that responsible government attorneys or agencies would stoop to such clandestine and underhanded tactics in the trial of a lawsuit. Such intrusions offend one's sense of fair play and subvert the proper administration of justice. Even without the restraint imposed by the sixth amendment, they may well constitute a denial of due process. Such was not the case here.

■ Reading the affidavits filed by the parties upon this critical issue, we are convinced that the trial court was simply unimpressed and unpersuaded that any such reprehensible activity was engaged in by Smith, the special agent of the Intelligence Division of the Internal Revenue Service at Fresno, or by Swanson under his direction. The affidavits of appellant are ambiguous and conjectural in their charges and directly

controverted by both Smith and Swanson.[5] In addition, they relate to matters that under careful consideration have little if anything to do with the basic issues of the lawsuit. Failure to file tax returns for the years in question was admitted by the defendant. Independent proof was introduced that he had earned substantial sums of money in the corresponding years. The evidence that these actions were willful was overwhelming. Nothing can be gained by reversing and remanding. We are of the opinion that neither the basic dictates of fair play or due process require a reversal or a remand for a full evidentiary hearing. A reading of the reporter's transcript and the rest of the record convinces us that the trial court, with a very great amount of patience and restraint, accorded appellant a fair and full trial.

■ Appellant's claim that he is entitled to a new trial because the government agent advised him to take the stand is also without merit. One affidavit, that of Claire Kelley, supports this allegation. The affidavit of the agent denies giving such advice. Since we conclude that Scott was not prejudiced by taking the stand, the conflict in the affidavits is irrelevant. Scott was not prejudiced because his testimony at trial did no more than reiterate his position about which there is no dispute. He conducted his own defense and indicated at the outset of the trial, in his opening state-

Constitution." For the years 1970, 1971, and 1972, Scott by his own testimony, admitted that he filed no returns whatsoever. During those years he earned in excess of $23,000 per year. On November 23, 1971, he wrote a letter to the editor of the Fresno Bee, saying among other things:

"I am a successful insurance agent earning an income far above the average worker. I do not pay income taxes—state or federal— . . .."

"I submit all income tax forms in blank. That is, I send no information and absolutely no money . . . ."

**5.** As an example, the appellant's brief states: "The affidavits (sic) also gave sworn statements that they had good reason to believe that Swan burglarized the defense conference

room in the Golden Key Motel and removed vital defense papers from a briefcase within the courtroom." The affidavit referred to, however, states only that Scott gave a copy of the government's requested instructions to the affiant (Ellsworth) who studied them and left them in his attache case in their conference room. When he opened his case in court the instructions with his comments, were missing. Affiant states that he has since been told that Swanson was seen leaving that particular room "when no one else was there, and where Affiant's attache case was usually left open because of a troublesome combination lock." This loss, it is asserted, seriously handicapped Scott because he had to borrow the prosecutor's copy of the government's requested instructions.

ment to the jury, that he did not pay his taxes. He asserted, however, that since he considered the income tax to be illegal, he could not be convicted.[6] His entire defense was predicated on convincing the jury that the income tax was illegal and this was reflected in his examination of the three witnesses he called for the defense. Likewise, Scott had previously written letters to the *Fresno Bee* admitting that he refused to pay taxes and urging others to also refuse.[7] These letters were part of the record below. There was never any question but that he committed the acts constituting the offense charged. He literally proclaimed it from the housetops. He proudly advocated his practice to others. Nor can it be said that Scott may have been prejudiced by exposing his demeanor to the jury when he took the stand. Scott acted as his own attorney, presenting his witnesses to the jury and cross-examining the government witnesses. He was allowed wide latitude by the court and told his own story in speeches made while cross-examining witnesses. At all times during the trial he was the principal character before the jury on the defense.

6. "I have already said that I will prove I am not guilty. The Government has to prove willfulness. And I will prove to you that I did not act willfully. That is the way they interpret it. I will tell you why I did what I did and why it is not evil." R.T. at 21.

"I will attempt to prove here that the Sixteenth Amendment, which is the income tax, violates our—yours and mine—Bill of Rights, Constitutional Rights . . . ."

\* \* \* \* \* \*

"One reason I'm here today is that I am chairman of the Tax Rebellion Committee. This was brought out by the Government lawyer. He knows that well. And I think one reason I'm here is because we have been, at least to some extent, effective.

"If you people read the magazines in the country, if you read *News and World Report,* if you read anything else that is nationwide, you know that there are millions—I don't mean just a few handfuls—I am talking about millions who don't pay income tax. And I have been selected. I am the victim of selective prosecution. They picked me out to prosecute me because I have been very active. I have had the opportunity to talk on the radio, TV, and at rallies, and I'm glad because I feel this way: I feel that I am the same spirit as were our forefathers." R.T. at 22–23.

7. "November 5, 1971

"Editor of the Bee,
"I noted with interest Stephen Ross's letter that you printed under date of October 31, 1971. Mr. Ross has learned exactly nothing from the past. He still believes in tax reform via the initiative and lobbying processes. These methods have been used for the past 50 years and where are we now? If you are waiting for tax justice, tax reform, tax equity, tax breaks at the hands of criminal politicians you will wait forever. History proves over and over again that corrupt government (that is what we have on our hands today), never voluntarily relinquishes power. Any kind of tax justice must be administered by the individual to himself. I personally have solved this problem. I have enjoyed tax justice to a large degree for the past three years. I have refused and do not pay the following taxes: Federal and State Income Taxes, Social Insecurity Taxes, Personal Property Taxes, Telephone Excise Tax, Utility Tax. I work hard for my money and if the thieves in government want it they will have to work harder to steal it from me. Mr. Ross mentioned in his letter a realistic alternative, or solution. We have it. The answer is absolute minimum government. Almost everyone recognizes the fact that government today is overwhelming and totally out of proportion. Volumes of proof show that at least 90% of government activities are not authorized in the original contract which contract is the U. S. Constitution. Tyrannical government must be taught the lesson that we the people are the masters and government the servant.

"Yours truly,
"/s/ Jim Scott
"Jim Scott"
Plaintiff's Exhibit No. 51.
"November 23, 1971
"Fresno Bee
Van Ness and Calavaras
Fresno, Ca
"Editor:
"This is a reply to Mrs. P. H. of Reedley who wonders whether or not I am an unemployed welfare recipient. I am a successful insurance agent earning an income far above the average worker. I do not pay income taxes, State or Federal, Social Insecurity Tax, Federal Excise Tax on the telephone, City Utility Tax or Personal Property Tax. Mrs. P. H. wants to know how I do it. My secret is a combination of conviction and sufficient courage to act. First I demand to be free. I refuse to be a tax-slave, allowing the fruits of my labors to be confiscated by

We recognize that the specter of active government interference in the defense of a criminal case is a chilling one. However, on the unique facts of this case we conclude that the ends of justice would not be served by requiring a new trial because there is no possibility that the defendant was prejudiced by the alleged interference.

■ The second major assignment of error is that Scott was discriminatorily singled out for prosecution because of his vocal opposition to the income tax. In order to prevail in this allegation appellant must bear the burden of proving at least a prima facie case. This requires that appellant first demonstrate that others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted. Secondly, appellant must show that his selection was based on an impermissible ground such as race, religion or his exercise of his first amendment right to free speech. *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974); *see United States v. Steele,* 461 F.2d 1148 (9th Cir. 1972); *United States v. Sacco,* 428 F.2d 264, 271 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).

■ Appellant fails in his claim of discriminatory prosecution because he had not demonstrated that others similarly situated who have failed to file income tax returns have not been prosecuted. "THE COURT: Let me ask you this: Do you know other people who

didn't file tax returns that the Government has not prosecuted? If so, I think you should make it known to Mr. Couris so he could start indicting them.

"MR. MATONIS: Well, your Honor, it is not my job as a lawyer to help the Government in cases of people who have or have not filed their income tax returns." R.T. at 26 (Supp.).

Thus, this case is clearly distinguishable from *United States v. Steele, supra,* where the court was convinced that the government had actual knowledge of other violators but compiled background reports and prosecuted only those who had taken a public stand against compliance with the census law. Here, appellant has only demonstrated that the government had an announced policy of vigorous enforcement of the tax law against those who took a public stand against filing returns. There was no evidence presented that the government did not prosecute others who failed to file returns but who did not take a vocal stand on the issue. It is not surprising that the government might prosecute those cases in which the violations of the tax laws appeared most flagrant.

■ Scott also assigned as error the refusal of the trial court to hold an evidentiary hearing on his motions for a new trial and arrest of judgment. The decision whether to hold an evidentiary hearing on a motion for a new trial is within the sound discretion of the trial judge. *United States v. Thompson,* 493

---

corrupt, squandering, criminal government. Thievery nauseates me, especially when I am the victim. Being self employed, I have no quivering, cowardly employer butchering my pay check by way of deductions and surrendering that money to government vultures. I submit all income tax forms in blank. That is, I send no information and absolutely no money. The 10% Federal Excise Tax on the telephone is easy. I merely deduct that tax from the bill and write a note of explanation to the company. The City Utility Tax is handled in the same manner. Not paying taxes is the most enjoyable and satisfying experience I have ever known. When I earn a dollar I get a dollar. Within reason, I buy everything I want and

pay cash for it. Whatever I do and wherever I go I do it first class. My life is very good, but it saddens me to see so many genuinely fine Americans made victims and suckers by politicians and bloodsucking bureaucrats. The freedom from governmental tyranny that I know can be had by all Americans if they will but shake loose the chains and exert themselves. When the sleeping giant (millions of taxslaves) awakes and arises, no force on the face of this earth can withstand.

"Sincerely,
"/s/ Jim Scott
"Jim Scott"
Plaintiff's Exhibit No. 52.

F.2d 305, 310 (9th Cir. 1974), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). We conclude that there was nothing to be gained by such a hearing and that the trial judge did not abuse his discretion by denying Scott's request.

Appellant raises many other alleged errors, but after a careful review of the record we find that they lack merit.

The judgment is affirmed.

BROWNING, Circuit Judge (dissenting):

I agree that appellant's charge of discriminatory prosecution must be rejected, but dissent from the dismissal of appellant's claim that, by the surreptitious intrusion of a government agent into the defense camp, he was denied due process and the effective exercise of his right to represent himself.

It is undisputed that Swanson was a paid undercover agent of the government posing as a member of a tax protestors organization. It is admitted that he attended appellant's trial in that capacity with the knowledge and approval of the IRS agent in Fresno associated with appellant's case. It is furthermore conceded that during the trial he participated in discussions and meetings among the tax protestors, including appellant, both in the courtroom and, at the close of the trial each day, in the motel where the group stayed. The exact nature of his participation is disputed. Affidavits submitted by appellant assert that Swanson discussed appellant's defense with appellant and his lay advisors, advised appellant regarding trial strategy, and urged him to take the stand. Swanson, by affidavit, admits that he attended conferences and meetings regarding the trial but asserts that he offered no advice.

Affidavits submitted by appellant also assert that Swanson was seen leaving appellant's room when no one else was present and that certain defense papers were subsequently missing. Swanson denies breaking into and entering appellant's room or removing his papers.

The majority correctly holds that appellant's contention that his rights under the Fourth Amendment were infringed must be rejected in light of *Hoffa v. United States*, 385 U.S. 293, 300–03, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The majority errs, however, in dismissing appellant's Fifth and Sixth Amendment claims.

I.

The majority recognizes that the Fifth Amendment may be violated by introducing a government agent into the defense camp. As the majority states, "government intrusion into the private councils of a *pro se* defendant, struggling to oppose that government during a trial, for the purpose or with the result of gaining trial advantages . . . offend[s] one's sense of fair play and subvert[s] the proper administration of justice . . . . [and] may well constitute a denial of due process." Yet the majority rejects appellant's Fifth Amendment claim, holding that he was not even entitled to a hearing to inquire into the nature of the intrusion or its consequences.

The majority concludes that appellant did not make a sufficient showing that Swanson did in fact intrude into the councils of appellant's defense, with the purpose or result indicated. Thus, the majority states that from reading the affidavits it is convinced that the trial court "was simply unimpressed and unpersuaded that any such reprehensible activity was engaged in." The majority holds that appellant's affidavits were deficient because they were "ambiguous and conjectural," were "directly controverted" by affidavits filed by the government, and related to matters that "have little if anything to do with the basic issues of the law suit."

The affidavits filed by appellant cannot be said to be "ambiguous and conjectural" with respect to the charge that Agent Swanson intruded into the councils of the defense and sought to influence defense strategy. Appellant's own affidavit states that "the confidentiality

and privacy of myself and my counsellors was admittedly invaded by" Agent Swanson. The affidavit of Claire Kelley, one of appellant's supporters, states "I saw and heard [Swanson] talking to [appellant] at the counsel table numerous times throughout the trial, discussing [appellant's] defense and advising [appellant] on strategy. [Swanson] . . . was persistent and pushy in seeking out and talking to [appellant]. I heard [Swanson] urge [appellant] to take the witness stand in his own defense." The Kelley affidavit continues, "I was in Room 214 of the Golden Key Motel, which was used by the defense for discussing and planning of strategy when [Swanson] was also present and took part in the discussion and was privy to confidential information concerning the defense." Although not as direct and categorical, the affidavit of William R. Dobslaw, Swanson's roommate at the Golden Key, corroborates the affidavits of appellant and Kelley.[1]

The majority concedes that the Kelley affidavit sufficiently raised the specific charge that Swanson advised appellant to take the stand. This charge is disposed of by asserting that appellant was not prejudiced by his appearance as a witness. But it cannot be said with assurance that this violation of appellant's Fifth Amendment rights was harmless beyond a reasonable doubt. Appellant's ultimate hope was that the spirit of protest that motivated his actions might elicit a receptive response from one or more of the jurors. His decision to take the stand may well have had a critical effect upon the realization of this hope. It is impossible to know beyond a reasonable doubt that it did not. The reaction of the jurors to appellant as an accused engaged in presenting his own defense may have been quite different from their reaction to appellant as a witness, particularly under the prosecutor's effective cross-examination.[2] Moreover, this court ought not to speculate as to the prejudice that might have resulted from a clandestine government agent's successful effort to influence the accused in a matter so fundamental to the defense as the decision to waive his privilege against self-incrimination, take the stand, and subject himself to cross-examination.

It is irrelevant that the affidavits submitted by appellant were contradicted by the affidavits filed by the government. The function of the affidavits was to determine whether relevant factual issues existed, not to resolve such issues. *Machibroda v. United States,* 368 U.S. 487, 493–95, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Wright v. Dickson,* 336 F.2d 878, 882–83 (9th Cir. 1964). *See also United States v. Guthrie,* 387 F.2d 569, 572 (4th Cir. 1967); 8A Moore's Federal Practice ¶ 33.03[3], at 33–18. The affidavits filed by appellants made out a prima facie case that a government agent had actively participated in the councils of appellant's defense and had sought to influence defense strategy. Since such

1. Dobslaw's affidavit states that Swanson "told me he had been in the 'Conference Room' (Room 214 of the Golden Key Motel), planning the trial strategy with Vaughn Ellsworth, Claire Kelley, Jim Scott, and Bill Drexler." The affidavit continues, "During recesses in the trial Swanson (alias Swan) was often up front around the defendant's counsel table, talking with [appellant] and his counselors. Exactly what he said on all of these occasions I do not know." Dobslaw's affidavit also states that during a recess Swanson "was talking to [appellant] and Claire Kelley. I did not catch everything he said, but I think it had to do with [appellant's] decision whether or not to take the witness stand. [Swanson] was encouraging [appellant] to take the stand. Swanson told [appellant] something to the effect: 'That's the way to get your story across,' or 'That's the only way to get your side across.'"

The affidavit of William E. Drexler, another of appellant's close associates, makes the specific allegation that Swanson was in appellant's room when no one else was present. Both Drexler and appellant imply that Swanson took certain defense papers when he was in the room, although neither claims to have more specific evidence that he did so.

2. The two letters quoted in footnote 7 of the majority opinion were introduced by the prosecution during cross-examination of appellant. The majority considers them to be prejudicial to appellant's cause; the jury may have also.

conduct would violate the Fifth Amendment, as the majority itself vigorously asserts, an evidentiary hearing was required to determine the facts. Appellant specifically requested such a hearing both in his motion [3] and in argument to the district court. It was denied.

The majority appears to say that nothing is to be gained by remand for an evidentiary hearing on appellant's due process claim generally because appellant has no valid defense on the merits of the criminal charge against him, and because (aside from the government's claimed invasion of the defense camp) appellant was afforded a fair and full trial by the trial court.

Whatever one may think of appellant's defense on the merits, he was and is entitled to a trial that comports with due process. The meticulous fairness of the trial judge is evident from the record, but as the majority so forcefully states, deliberate intrusions by the prosecution upon a *pro se* defendant's private councils "offend one's sense of fair play and subvert the proper administration of justice." To paraphrase Mr. Chief Justice Burger in his concurring opinion in *Mayberry v. Pennsylvania,* 400 U.S. 455, 467–68, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), a criminal trial is not a private matter; more is at stake than the interests of the accused. The public interest in the integrity of the judicial process, and in the appearance of justice, as well as its substance, require that sanctions be imposed upon the government for such corrupting conduct. *See United States v. Rosner,* 485 F.2d 1213, 1227 (2d Cir. 1973); *United States v. Rispo,* 460 F.2d 965, 977 (3d Cir. 1972).

## II

The greater part of the majority opinion deals with appellant's reliance upon *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967);

*Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953); and *Coplon v. United States,* 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), in which new trials were ordered because the government had intruded into the confidential relationship between the accused and his counsel by electronic surveillance or through government agents. The majority rejects appellant's reliance upon these and similar authorities primarily on the ground that they are based upon interference with the Sixth Amendment right to effective assistance of counsel, and appellant in this case waived that right.

This facile disposition neglects the fact that the accused in a criminal case has a constitutional right to defend himself that is equal in dignity to his constitutional right to counsel. "Implicit in both [the Fifth and Sixth] amendments is the right of the accused personally to manage and conduct his own defense in a criminal case." *United States v. Plattner,* 330 F.2d 271, 274 (2d Cir. 1964). "The right to counsel and the right to defend *pro se* in criminal cases form a single, inseparable bundle of rights, two faces of the same coin." *Id.* at 276. "A defendant in a criminal case not only has a constitutional right to the assistance of counsel, he has a correlative constitutional right to refuse the advice or interference of counsel and to present his own case." *Arnold v. United States,* 414 F.2d 1056, 1058 (9th Cir. 1969), *quoted in United States v. Price,* 474 F.2d 1223, 1226 (9th Cir. 1973).

The vice of government intrusions into the relationship between the accused and his trial lawyer is not simply a corollary of the general principle that the lawyer-client relationship is a confidential one, as the majority suggests. Such intrusions are condemned because they constitute an unwarranted infringement upon the accused's Sixth Amendment right to

---

3. Appellant's request for a hearing at which he could examine Swanson and other witnesses was in the form of a motion to the court "that if it refuses to grant a new trial, to grant a stay and issue a subpoena to the IRS, to bring undercover agents, JAMES Q. SWANSON [aka JEFF SWAN], ROGER D. SMITH · AND JOHN DOE an unknown undercover agent in and he prays the court for leave to take depositions."

the effective assistance of counsel. In much the same way, government intrusions into the councils of an accused acting *pro se* are an unjustifiable interference with the unfettered exercise by the accused of his constitutional right to conduct his own defense.[4]

Three of appellant's supporters—Claire Kelley, Vaughn Ellsworth, and William Drexler—played a particularly active role in presenting appellant's defense. They were permitted to sit at the counsel table during trial. Appellant consulted with them frequently during the taking of testimony. They participated in hearings on various motions. They argued appellant's constitutional points and discussed jury instructions with the trial court. They conferred with appellant outside the courtroom, planning strategy, assembling cases and documents, and marshaling arguments for later use in court. In short, they performed functions typically reserved to members of the bar. The impairment of the full and free exercise of appellant's constitutional right to conduct his own defense resulting from the intrusion of a government agent into the conferences between appellant and these lay advisors cannot be distinguished from the interference with appellant's Sixth Amendment right that would have been present had these advisors been lawyers.

This is not to say that appellant had a constitutional right to the assistance of his friends in presenting his defense in the manner permitted by the trial court.[5] Having been allowed that assistance,

however, the government could not seize the opportunity it presented to interfere with appellant's exercise of his right to defend himself by interposing a government agent into the relationship.

On the other hand, the right of the accused to be free of government interference in the presentation of his defense does not depend upon the use of lay advisors. The accused's exercise of his right to defend himself does not grant the government a license to spy, whether the accused acts alone or has the help of others.

The majority asserts that the cases relied upon by appellant do not apply a per se rule requiring remand whenever the government has had access to a communication between an accused and his counsel; and the majority concludes that remand would not be appropriate in this case because there was no prejudice. The majority cannot mean that surreptitious government invasion of the councils of the defense requires reversal only if the defendant can establish specific prejudice. The Supreme Court's decisions in *O'Brien v. United States, supra,* 386 U.S. 345, 87 S.Ct. 1158, and *Black v. United States, supra,* 385 U.S. 26, 87 S.Ct. 190, clearly hold to the contrary, and bind this court.

What is suggested by the cases cited by the majority, and similar cases, is that reversal is not required if there was in fact no intrusion into the councils of the defense at all,[6] or no knowing intrusion,[7] or the intrusion was minimal and

4. The constitutional right of the accused to conduct his own defense was recognized by the Supreme Court in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), decided after the opinions in this case were filed.

5. *Cf. Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in which the Court intimates that the Sixth Amendment right to "Assistance of Counsel", may encompass the assistance of lay advisors. As the Court pointed out:

The first lawyers were personal friends of the litigant, brought into court by him so that he might "take 'counsel' with them" before pleading. 1 Pollock & Maitland, History of English Law 211 (1909). Similarly,

the first "attorneys" were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212–213.

At 820 n.16, 95 S.Ct. at 2534.

6. *United States v. Rosner,* 485 F.2d 1213, 1224 (2d Cir. 1973); *United States v. Alderisio,* 424 F.2d 20, 24 (10th Cir. 1970). *See also Manuel v. Salisbury,* 446 F.2d 453 (6th Cir. 1971).

7. *United States v. Brown,* 484 F.2d 418, 424–25 (5th Cir. 1973); *United States v. Bullock,* 441 F.2d 59, 64 (5th Cir. 1971).

demonstrably involved nothing related to the case in trial,[8] or the intrusion was such that it could not have prejudiced the accused.[9]

Whether an intrusion has occurred and, if so, its nature and extent, are questions of fact. In all of the cases cited the facts had been established by an evidentiary hearing, or the appellate court ordered that such a hearing be held. There has been no evidentiary hearing with respect to Swanson's activities. It must be assumed that they were as alleged in appellant's affidavits. The majority has cited no case in which a showing of specific prejudice was required where, as here alleged, a government agent deliberately participated on a continuing basis in conferences and councils concerned with the trial of the criminal case at hand. These allegations present "government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel," which the Court in *Hoffa v. United States, supra,* 385 U.S. at 306–07, 87 S.Ct. at 416, assumed would require setting aside a conviction. In such a case the potential for prejudice permeates the proceeding; "the probability of unfairness due to the Government's misconduct is incapable of realistic delineation." *United States v. Rispo, supra,* 460 F.2d at 976.[10] Assuming the facts to be as asserted in appellant's affidavits, the burden at least rests upon the government to establish that the interference with appellant's constitutional right to defend himself was harmless beyond a reasonable doubt. *Id. at* 977.

The majority suggests that prejudice was impossible because appellant's de-

fense was known to all, and was in any event without legal merit. Whether or not appellant was guilty of the charge against him, he was entitled to be fairly tried and to freely exercise his right to represent himself without interference or obstruction by the prosecution. The fact that appellant's general line of defense was well known does not mean that his trial tactics and strategy were foreordained. Swanson allegedly sought to influence at least one element of that strategy (appellant's decision to take the stand) in a way that might have affected the outcome.

Finally, the majority asserts that "there is no evidence in the record to refute the affidavit of the agent that he [furnished] no information about the defense to the prosecution." Only the government could produce such evidence. Appellant sought to take the deposition of the agents and was rebuffed.[11] In any event, while it would aggravate the evil if Swanson passed information to the government attorneys, it would not eliminate the evil if he did not. The central vice in the "surreptitious invasion by a government agent into the legal camp of the defense" is the interference with appellant's right to represent himself. *Cf. Hoffa v. United States, supra,* 385 U.S. at 306–07, 87 S.Ct. at 416. The conviction in *O'Brien v. United States, supra,* 386 U.S. 345, 87 S.Ct. 1158, was reversed even though it was established that no information concerning the conversations intercepted by the FBI had been relayed to prosecuting attorneys.

A remand should be ordered in this case with instructions to hold an evidentiary hearing. If it is shown that Swan-

---

**8.** *United States v. Brown,* 484 F.2d 418, 424–25 (5th Cir. 1973); *Taglianetti v. United States,* 398 F.2d 558, 570 (1st Cir. 1968); *cf. Hoffa v. United States,* 385 U.S. 293, 308, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

**9.** *United States v. Mosca,* 475 F.2d 1052, 1060–61 (2d Cir. 1972); *South Dakota v. Long,* 465 F.2d 65, 71–72 (8th Cir. 1972).

**10.** *See also United States v. Rosner,* 485 F.2d 1213, 1227 (2d Cir. 1973).

**11.** Appellant cites passages from the examination of witnesses by the prosecution that he contends were necessarily prompted by information obtained from the defense. The inference is not strong. Admittedly, however, Swanson did communicate with the prosecution about defense tampering with a trial exhibit, lending some credibility to the contention that Swanson may have also communicated information relevant to appellant's legitimate defense.

son knowingly intruded in any substantial way into conferences relating to the defense of this case, a new trial should be ordered.